OPINION OF THE COURT
Titone, J.
Pursuant to its client’s instructions, defendant law firm furnished to plaintiff third party an opinion letter that assertedly contained false assurances. While a law firm supplying such a letter may have a duty running to the third parties, the record in this case does not support the conclusion that the assertion in the opinion letter caused plaintiff’s loss. We thus conclude that summary judgment was properly awarded to this defendant.
*380 I
The relevant facts are essentially undisputed and can be briefly summarized. In early 1986, United States Lines (U.S. Lines), a major shipping concern, informed the Prudential Insurance Company of America (Prudential) and certain of its other key creditors that it was anticipating difficulty in meeting its debt obligations. Prudential thereafter agreed to a restructuring of a $92,885,000 debt that U.S. Lines owed it in connection with a 1978 loan. At the time, that debt was secured by a first preferred fleet mortgage on certain vessels owned by U.S. Lines.
In order to implement the debt restructuring, Prudential and U.S. Lines executed an amendment to the financing and security agreement that they had entered into when the 1978 loan was made. Section 4 of that amendment set forth various conditions to Prudential’s agreeing to the restructuring, including a requirement that Prudential receive "[t]he favorable opinion of Messrs. Gilmartin, Poster & Shafto [Gilmartin], counsel to [U.S. Lines], to such effect as shall be satisfactory to Prudential.”
In fulfillment of that requirement, Gilmartin, at the specific direction of U.S. Lines, thereafter drafted and delivered an opinion letter to Prudential. The opinion letter contained an assurance that the mortgage documents that were to be recorded in connection with the debt restructuring, and which, incidentally, had been prepared by other counsel, represented "legal, valid and binding” obligations of U.S. Lines. Moreover, according to Gilmartin’s letter, neither Federal nor State law would interfere "with the practical realization of the benefits of the security intended to be provided” by those documents. Prudential ultimately accepted Gilmartin’s opinion letter as satisfactory, and permitted the recording of those mortgage documents. Prudential later learned that one of the recorded documents erroneously stated the outstanding balance of the first preferred fleet mortgage securing the debt as $92,885, rather than the correct sum of $92,885,000. As a result, Prudential suffered significant losses when U.S. Lines subsequently filed for bankruptcy. Those losses ultimately included 17.5% of the net proceeds ($11,400,000) from a foreclosure sale of five of the ships involved in the first preferred fleet mortgage, which percentage Prudential had agreed to pay U.S. Lines in settlement of their dispute at the time the validity of the mortgage was in doubt. The claimed losses also *381 included the related Federal court litigation costs associated with defending the mortgage (see, Prudential Ins. Co. v S. S. Am. Lancer, 870 F2d 867 [2d Cir 1989]).
Prudential thereafter commenced this action against Gil-martin, contending that the law firm’s opinion letter had falsely assured it that the mortgage documents in question would fully protect its existing $92,885,000 security interest. Although Prudential acknowledged that it was not actually in privity with Gilmartin, it nevertheless contended that the relationship between them was sufficiently close so as to support a cause of action in negligence. Alternatively, it maintained that Gilmartin could be held liable to it, in contract, on a third-party beneficiary theory.
Following joinder of issue, Gilmartin moved for summary judgment on both causes of action. After reviewing the various submissions of the parties, the Supreme Court, New York County, granted Gilmartin’s motion. The court reasoned that the law firm’s relationship with Prudential was, under the circumstances, too attenuated to give rise to any duty of care running from Gilmartin to Prudential. Similarly, the court found that, at the very most, Prudential was an incidental beneficiary of Gilmartin’s agreement with U.S. Lines relating to the preparation of the opinion letter. Prudential thus lacked the standing of an intended beneficiary to bring suit on any misstatements in the letter which may have caused its losses. On appeal, the Appellate Division affirmed the grant of summary judgment to Gilmartin (170 AD2d 108). That Court then granted Prudential leave to appeal to this Court pursuant to CPLR 5602 (b), certifying the following question of law: "Was the order of this Court, which modified the order of the Supreme Court, properly made?”
II
Initially, it must be stressed that attorneys, like other professionals, may be held liable for economic injury arising from negligent representation. Although the defendants in many of the prior cases addressing this issue have been accountants, there is no reason to arbitrarily limit the potentially liable defendants to that class of professionals (see, Ossining Union Free School Dist. v Anderson LaRocca Anderson, 73 NY2d 417, 424). Indeed, liability was imposed on engineering consultants in Ossining (supra), and in Ultra-mares Corp. v Touche (255 NY 170, 188) and Glanzer v *382 Shepard, (233 NY 236, 240), it was suggested that in the right circumstances pecuniary recovery might be had from lawyers. We now conclude that in circumstances such as these, a theoretical basis for liability against legal professionals can be presented.
Gilmartin contends that Canons 4 and 5 of the Code of Professional Responsibility, regarding the preservation of client loyalty and client confidences, argue against imposing liability on attorneys in these circumstances. However, where, as here, the negligent acts, i.e., the creation of an opinion letter and the transmission of that letter to a third party for the party’s own use, were carried out by the lawyer at the client’s express direction, the ethical considerations of Canons 4 and 5 are insufficient reason to insulate attorneys from liability (see, Crossland Sav. v Rockwood Ins. Co., 700 F Supp 1274, 1282-1283; Vereins-Und Westbank, AG. v Carter, 691 F Supp 704, 715-716).
Ill
Having concluded that legal professionals are not immune from liability in these cases, we turn now to the question whether liability may attach in the present circumstances. This Court has long held that before a party may recover in tort for pecuniary loss sustained as a result of another’s negligent misrepresentations there must be a showing that there was either actual privity of contract between the parties or a relationship so close as to approach that of privity (see, e.g., Ossining Union Free School Dist. v Anderson LaRocca Anderson, supra, at 424; Credit Alliance Corp. v Andersen & Co., 65 NY2d 536; Ultramares Corp. v Touche, supra; Glanzer v Shepard, supra). Such a requirement is necessary in order to provide fair and manageable bounds to what otherwise could prove to be limitless liability (see, Ossining Union Free School Dist. v Anderson LaRocca Anderson, supra, at 421).
Since Prudential concedes that it was not in direct privity with Gilmartin, we must determine whether the relationship between Prudential and Gilmartin was sufficiently close to support liability. For that purpose, we must look first to the substantial body of decisional law delineating the boundaries of liability to parties not in privity. In Glanzer v Shepard (233 NY 236, supra) a bean seller retained public weighers and directed them to furnish one copy of the weight certificate to a particular prospective buyer. The certificate was inaccurate *383 and, as a result, the buyer suffered a loss. In language that is as applicable now as it was then, this Court concluded that the law imposed a duty on the weighers in favor of the buyer, despite the absence of privity between them, because the representations at issue had been made "for the very purpose of inducing action” on the part of the buyer (id., at 239). In other words, the buyer’s use of the certificates was "not an indirect or collateral consequence” of the action of the weighers. Rather, it was a consequence which, to the weighers’ knowledge, was the "end and aim of the transaction” (id., at 238-239).
By contrast, in Ultramares Corp. v Touche (255 NY 170, supra), where accountants had prepared a certified balance sheet for their client and provided some 32 copies to be exhibited generally to "banks, creditors, stockholders, purchasers or sellers, according to the needs of the occasion” (id., at 173-174), the accountants were not liable to third parties who may have relied on the financial information to their detriment. That was so because the accountants’ report was primarily intended as a convenient instrument for the client’s use in developing its business and only "incidentally or collaterally” was it expected to assist those to whom the client "might exhibit it thereafter” (id., at 183).
In White v Guarente (43 NY2d 356), accountants had contracted with a limited partnership to perform an audit and prepare the partnership’s tax returns. It was clear that the accountants’ services were obtained to benefit the specific members of the partnership, "a known group possessed of vested rights, marked by a definable limit and made up of certain components” (id., at 361). In these circumstances, this Court held that the relationship between the parties, accountants and a limited partner, was clearly one approaching privity.
Similar conclusions were reached in the more recent cases dealing with this issue. In Credit Alliance, where we held the allegations insufficient to establish a relationship approaching privity between the plaintiffs and defendant accountants, there were no direct dealings between the plaintiffs and defendants, no specific agreement by the defendants to prepare the report for the plaintiffs’ use or according to the plaintiffs’ requirements, no specific promise to provide the plaintiffs with a copy of the report, and no actual provision of the report to the plaintiffs by the defendants. In sum, the *384 necessary link between the relevant parties simply did not exist and there was no basis for liability.
Conversely, in the companion case (European Am. Bank & Trust Co. v Strauhs & Kaye, 65 NY2d 536), the prerequisites for the cause of action in negligence, as well as in gross negligence, were fully satisfied because the defendant accounting firm was well aware that a primary "end and aim” of its auditing process was to provide the third-party plaintiff with the financial information it required. Not only did the accountants know the identity of the specific nonprivy party who would be relying on their reports, but they were also aware of the particular purpose for their services and they engaged in conduct creating an unmistakable relationship with the plaintiff, including having direct written, oral and in-person communications with the plaintiff’s representatives. Significantly, the opinion in Credit Alliance distilled the principles emerging from the prior case law and identified three critical criteria for imposing liability: (1) an awareness by the maker of the statement that it is to be used for a particular purpose; (2) reliance by a known party on the statement in furtherance of that purpose; and (3) some conduct by the maker of the statement linking it to the relying party and evincing its understanding of that reliance (id., at 551).
In the two cases decided since Credit Alliance, we have applied its criteria to sustain liability in one instance and foreclose it in another. In Ossining Union Free School Dist. v Anderson LaRocca Anderson (73 NY2d 417, supra), the plaintiff school district was permitted to recover for pecuniary loss arising from negligent misrepresentations in reports prepared by two engineering consultants who were retained by the school’s architects. We held that the consultants had a duty to the school district, notwithstanding the absence of privity, because "[n]ot unlike the bean weighers in Glanzer, [the consultants] allegedly rendered their reports with the objective of thereby shaping this plaintiff’s conduct” (id., at 426). In contrast, in Security Pac. Bus. Credit v Peat Marwick Main & Co. (79 NY2d 695), we held that there was no relationship between the plaintiff and the defendant accounting firm "sufficiently approaching privity” because no claim was made and no evidence tendered that the accounting firm’s report was to be prepared for the specific purpose of inducing the plaintiff’s reliance, there was no evidence that the firm had shaped its audit opinion to meet any of the plaintiff’s needs, and no proof that the firm had directly supplied the plaintiff with a copy of *385 the audit report or opinion, or ever agreed to do so (id., at 706-707). Additionally, there was no claim that the firm was aware that ” 'a primary, if not the exclusive, end and aim of auditing its client was to provide [plaintiff] with the financial information it required’ ” (id., at 707).
The Credit Alliance criteria and the cases on which those criteria are based clearly support the imposition of liability here. First, it is undisputed that Gilmartin was well aware that the opinion letter which U.S. Lines directed it to prepare was to be used by Prudential in deciding whether to permit the debt restructuring. Thus, the end and aim of the opinion letter was to provide Prudential with the financial information it required. Indeed, the amendment to the 1978 financing and security agreement made Prudential’s receipt of the opinion letter a condition precedent to closing.
Second, as fully expected by Gilmartin, Prudential unquestionably relied on the opinion letter in agreeing to the debt restructuring. Specifically, Prudential focused on certain statements in the letter which assured it, generally, that the mortgage documents represented "legal, valid and binding” obligations of U.S. Lines which, once recorded, would be enforceable against it "in accordance with [their] respective terms.” Finally, by addressing and sending the opinion letter directly to Prudential, Gilmartin clearly engaged in conduct which evinced its awareness and understanding that Prudential would rely on the letter, and provided the requisite link between the parties. Accordingly, contrary to the conclusion of the courts below, the bond between Gilmartin and Prudential was sufficiently close to establish a duty of care running from the former to the latter. Since this determination disposes of the question of Gilmartin’s liability, we find it unnecessary to reach Prudential’s alternative contract claim.
IV
Having concluded that Gilmartin owed Prudential a duty of care, we now turn to the question of whether Prudential has demonstrated that there is a triable issue of fact as to whether that duty was breached here (see, CPLR 3212 [b]). In support of its claim that Gilmartin breached a duty owing to it, Prudential contends that the opinion letter falsely assured it that the mortgage documents in question would continue to fully protect its existing $92,885,000 security interest.
Initially, it should be stressed that the purpose of an opin *386 ion letter, as correctly spelled out by defendant, is to offer assurances to the creditor about the inner workings of the borrower’s business, in particular, that no further corporate formalities are necessary to make the loan documents valid; that the documents are fully authorized under applicable law; that the terms, as written, are enforceable against the borrower; and that the proposed transaction does not violate some other obligation by which the borrower is bound. An examination of the opinion letter reveals that, although it did not make the specific assurance of a dollar amount of security, it did fulfill its purpose of assuring procedural regularity in forming the opinion.
The opinion letter initially made clear that, in rendering its opinion, Gilmartin had relied in part upon certificates of certain public officials and corporate officers, and upon corporate documents and records, with respect to the accuracy of material factual matters which were not independently established. Then, with reference to the mortgage documents in issue, the letter simply stated that those documents represented "legal, valid and binding” obligations of U.S. Lines, which, when recorded, would be enforceable against it "in accordance with [their] respective terms”, whatever those terms might be. No specific dollar amount was assured.
Next, Gilmartin qualified its opinion by limiting the enforceability of the mortgage documents by the bankruptcy, insolvency, reorganization and other similar laws of general application affecting creditors’ rights. Finally, Gilmartin further qualified its assurances when it said that "[t]he rights and remedies set forth in the [ship mortgages] are subject to applicable state laws which, in our opinion, will not interfere with the practical realization of the benefits of the security intended to be provided thereby.”
In sum, a duty of care was owed to Prudential in these circumstances, and the facts do not prove a breach of that duty. In preparing the opinion letter, Gilmartin represented that it took the particular procedural measures, as discussed above, in investigating and substantiating the mortgage documents in question. After taking those measures, Gilmartin made certain general assurances to Prudential in the opinion letter. Those assurances did not set forth a specific dollar amount as securing the debt. It was agreed that the letter was to be in a form satisfactory to Prudential, which condition was satisfied when Prudential accepted the letter containing no *387 more than general assurances. We can only conclude on these facts, where neither procedural nor substantive misrepresentations were made by Gilmartin, that the law firm was properly awarded summary judgment.
Accordingly, the order of the Appellate Division should be affirmed, with costs, and the certified question should be answered in the affirmative.
Acting Chief Judge Simons and Judges Kaye, Hancock, Jr., and Bellacosa concur; Judge Smith taking no part.
Order affirmed, etc.