991 F.2d 1501
 Thomas R. WAGGONER, Patricia Waggoner,
Plaintiffs-Third-Party Defendants-Appellants,
v.
SNOW, BECKER, KROLL, KLARIS & KRAUSS, a New York
Corporation; Snow, Becker, Krauss, a New York
Corporation; Elliot H. Lutzker,
Defendants-Third-Party
Plaintiffs-Appellees,
and
Staar Surgical Company, a Delaware corporation, Third-Party-Defendant.
 No. 91-56288.
 United States Court of Appeals,
Ninth Circuit.
 Argued and Submitted Feb. 3, 1993.
Decided April 22, 1993.
 
 Marc J. Poster, Greines, Martin, Stein & Richland, Beverly Hills, CA, Richard A. Love, Los Angeles, CA, for plaintiffs-third-party defendants-appellants.
 Allyn O. Kreps, Kim Thurman Spirito, Lewis, D'Amato, Brisbois & Bisgaard, Los Angeles, CA, for defendants-third-party plaintiffs-appellees.
 Appeal from the United States District Court for the Central District of California.
 Before: WALLACE, Chief Judge, SNEED and HALL, Circuit Judges.
 SNEED, Circuit Judge:
 
 
 1
 Thomas Waggoner and his wife Patricia appeal the district court's grant of summary judgment for defendants Elliot Lutzker and the law firm of Snow, Becker, Kroll, Klaris & Krauss, P.C. We affirm.
 
 I.
 FACTS AND PRIOR PROCEEDINGS
 
 2
 Thomas Waggoner is a cofounder of STAAR Surgical Company (Staar), a publicly held company incorporated in California in 1982.[1] Until 1989, he was also its Chief Executive Officer and a member of its Board of Directors (Board). Waggoner hired defendant Elliot Lutzker as counsel for Staar in 1984.[2] In April of 1986, Lutzker supervised Staar's reincorporation to Delaware.
 
 
 3
 From 1982 to 1986, Staar was principally engaged in the manufacture and sale of a patented soft intraocular lens (IOL) used in treating cataracts. In 1986 Staar expanded into other markets. In July 1987, however, finding the company short of capital, Staar negotiated a line of credit from the Bank of New York (BONY), secured primarily by accounts receivable and inventory. By September of 1987, BONY determined that Staar was under-collateralized and over-advanced on its credit line by almost $2 million. BONY threatened to discontinue the credit line and initiate foreclosure proceedings unless Staar's officers would personally guarantee the outstanding loans.
 
 
 4
 On December 13, 1987, the Staar Board convened to discuss the company's options. During the course of that meeting, Waggoner declared that he was willing to guarantee $3.5 million of BONY debt and $2.8 million of other debt in exchange for voting control of Staar for as long as his personal guarantees were outstanding. Lutzker was at the meeting and reminded everyone there that he was present only in his capacity as counsel for Staar.
 
 
 5
 On December 16, 1987, BONY informed Waggoner that he had only three days in which to provide the Bank with a written personal guarantee of the overdrawn line of credit. Staar's directors convened an emergency telephone meeting on December 17, 1987. At that meeting, Waggoner explained Staar's financial straits to the directors and advised them that he was the only person who could afford to guarantee personally Staar's debt. The Board then adopted a resolution transferring 100 shares of Class A Preferred Stock to Waggoner in exchange for his guarantee. One of those shares was to be convertible into 2 million shares of common stock after January 16, 1988, if Waggoner's guarantees were still outstanding.
 
 
 6
 Following that meeting, at the Board's direction, Lutzker drew up the Shareholders Agreement and the Certificate of Designation, the papers necessary to transfer voting control of the company to Waggoner. Waggoner had the documents reviewed by Staar's California patent counsel, Frank Frisenda, and on December 24, 1987, Waggoner personally guaranteed Staar's debt and pledged his Staar stock to BONY. Although Staar's directors tried to obtain financing in order to replace Waggoner's guarantees in the month that followed, they were not successful. Consequently, on January 19, 1988, after consulting with Lutzker, Waggoner converted one of his Preferred shares in exchange for 2 million shares of common stock.
 
 
 7
 Staar's financial trouble continued throughout 1988 and early 1989. Finally, in the summer of 1989, Staar considered the possibility of a merger with Vision Technologies, Inc. (VTI). VTI submitted a written proposal to Staar regarding a potential merger on June 29, 1989. On July 22, 1989, another company, by the name of Chiron, submitted a bid to acquire Staar's IOL business. On August 8, 1989, the Board, including Waggoner, adopted a resolution that Staar would attempt in good faith to complete a merger with VTI. The Board sent Chiron written notice terminating negotiations on August 9, 1989. In spite of the Board's resolution, however, Waggoner continued negotiations with Chiron. On August 10, 1989, one of Staar's directors unexpectedly discovered Waggoner in a secret meeting with Chiron agents at Staar's offices.
 
 
 8
 The Board convened an emergency meeting without Waggoner the next day. The Board found that Waggoner had violated his fiduciary duties to Staar and voted to remove Waggoner from his positions as president, CEO, and director of Staar. In response, Waggoner called Lutzker to ascertain if his preferred stock empowered him to remove the other directors from the Board and create a new Board. Lutzker informed Waggoner that he knew of nothing to hinder Waggoner from using his voting power in that manner. Thus, after voting to remove the other directors from the Board, Waggoner named a new Board consisting of himself, his wife and one vacancy. Waggoner sent his written consent regarding the removal of the other directors to Lutzker, who informed the other Board members what had transpired.
 
 
 9
 The Board members sought relief in court, filing two suits in Delaware. As a result of the ensuing litigation, Waggoner lost his position in and control over Staar. He also lost ownership of the common stock which he had allegedly derived from the convertible preferred stock.[3]
 
 
 10
 On August 23, 1990, Waggoner filed this diversity action for legal malpractice against Lutzker and Snow Becker. Waggoner alleged that the defendants breached their duty of care because Lutzker: negligently failed to include the power to fix voting rights among the Board of Directors' powers when Staar was reincorporated in Delaware; failed to advise Waggoner that the Board did not have the power to fix voting rights; and knew or should have known that the Board lacked that power. Waggoner further alleged that Lutzker was aware that Waggoner would rely on his advice, that Waggoner did in fact rely on that advice, and that Waggoner suffered damage as a result. On September 12, 1991, the district court granted summary judgment for the defendants.
 
 
 11
 This diversity action requires exploration of the limits of liability for alleged malpractice under the laws of either New York or California by an attorney whose advice was relied on by both a corporation and one of its officers. Because the relevant transactions had contacts in both New York and California, it is necessary to determine the proper law to fix the limits of the attorney's liability.
 
 
 12
 The district court resolved these issues by finding that the defendants showed as a matter of law that: (1) there was no direct attorney-client relationship between Lutzker and Waggoner during the instances when Waggoner asserts he detrimentally relied on Lutzker's advice; (2) California's choice of law test required the district court to apply New York law to the action before it; and (3) New York law required the court to dismiss Waggoner's case because there was no privity between Lutzker and Waggoner. Waggoner timely appealed.II.
 
 JURISDICTION AND STANDARDS OF REVIEW
 
 13
 The district court had jurisdiction pursuant to 28 U.S.C. § 1332. This Court has jurisdiction under 28 U.S.C. § 1291. We review the district court's order granting summary judgment de novo. Kruso v. International Tel. & Tel. Corp., 872 F.2d 1416, 1421 (9th Cir.1989), cert. denied, 496 U.S. 937, 110 S.Ct. 3217, 110 L.Ed.2d 664 (1990). Summary judgment is appropriate if the evidence, construed in the light most favorable to the nonmoving party, shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fu-Kong Tzung v. State Farm Fire & Casualty Co., 873 F.2d 1338, 1339-40 (9th Cir.1989). This Court also reviews de novo the district court's ruling on choice of law, see Sparling v. Hoffman Constr. Co., 864 F.2d 635, 641 (9th Cir.1988), and its interpretation of state law, see In re McLinn, 739 F.2d 1395, 1397 (9th Cir.1984) (en banc).
 
 III.
 DISCUSSION
 A. Attorney-Client Relationship
 
 14
 Waggoner first contends that Lutzker and Snow Becker are liable to him for Lutzker's negligence because Lutzker was acting as Waggoner's attorney during the preferred stock transaction.[4] New York and California treat the formation of an attorney-client relationship similarly. An attorney-client relationship is formed when an attorney renders advice directly to a client who has consulted him seeking legal counsel. Beery v. State Bar, 43 Cal.3d 802, 239 Cal.Rptr. 121, 739 P.2d 1289, 1293 (1987); Brandman v. Cross & Brown Co., 125 Misc.2d 185, 479 N.Y.S.2d 435, 437 (Sup.Ct.1984). A formal contract is not necessary to show that an attorney-client relationship has been formed. Bernstein v. State Bar, 50 Cal.3d 221, 266 Cal.Rptr. 625, 786 P.2d 352, 356 (1990). The court may look to the intent and conduct of the parties to determine whether the relationship was actually formed. Hecht v. Superior Court, 192 Cal.App.3d 560, 565, 237 Cal.Rptr. 528, 531 (Ct.App.1987).
 
 
 15
 To support his allegation that Lutzker acted as his counsel during the preferred stock transaction, Waggoner emphasizes that: (1) Lutzker informed him by telephone between the December 13th and December 17th meetings in 1987 that Delaware law did not prevent Staar from transferring preferred stock with a conversion feature to Waggoner; (2) the Board approved of the transaction only after Lutzker represented to all the Board members, including Waggoner, that the Board was authorized to issue super majority voting stock in exchange for Waggoner's guarantees; (3) Lutzker sent Waggoner the documents regarding the voting stock exchange for review and advised Waggoner that they complied with all the necessary laws and regulations; (4) Lutzker reassured Waggoner that the voting rights were valid in January 1988 and in the summer of 1988; (5) Lutzker assured Waggoner that he could exercise his voting rights should the need arise, and advised him on the procedure involved; and (6) Lutzker did not advise him to seek outside counsel until the summer of 1989. While Lutzker does not contest that he spoke with Waggoner on these occasions, Lutzker contends that any advice he rendered to Waggoner was only in his role as corporate counsel for Staar.
 
 
 16
 Despite Waggoner's allegations, the intent and conduct of the parties supports the district court's finding that Waggoner and Lutzker were not in an attorney-client relationship. As noted above, it is undisputed that Lutzker informed everyone at the Board meeting on December 13, 1987, including Waggoner, that Lutzker was only present as counsel for Staar and that he did not represent Waggoner. Waggoner's claim is further undermined by his own repeated references to Lutzker as corporate counsel and to Rick Love as his personal counsel. Before the Delaware court, Waggoner specifically stated that Lutzker was "not empowered to negotiate" for him and did not negotiate on his behalf regarding the merger discussions with VTI. He described Lutzker as "corporate counsel" at his September 11, 1989 deposition in preparation for proceedings in the Delaware court and at trial before that court. On September 13, 1989, in an attempt to clarify the situation, an attorney asked Waggoner: "So when you say 'your attorney' you are talking about Mr. Love?" Waggoner responded: "Mr. Love is my attorney, Mr. Lutzker is not." Finally, Waggoner's counsel at the Delaware trial made a point of establishing that Lutzker was Staar's corporate counsel in response to allegations by the other directors that Lutzker had not acted appropriately on behalf of the Board. He pointed out that: Lutzker had been described as corporate counsel by virtually all the directors; the directors sought his counsel about filing a bankruptcy petition; and Lutzker prepared the minutes of Board meetings even after Waggoner purportedly removed them as directors. Thus, the district court did not err by granting summary judgment for defendants on the issue of whether an attorney-client relationship existed between Waggoner and Lutzker.
 
 B. Choice of Law
 
 17
 Waggoner argues, alternatively, that the district court erred by granting summary judgment for defendants because there is a genuine issue regarding Lutzker's liability to Waggoner as a third party. Although the district court conceded that Waggoner would be able to pursue a claim for liability in California, the district court found that New York law applied and that the defendants were entitled to summary judgment under New York law. Thus, before we reach the issue of whether New York law precludes liability in this case, we must determine whether the district court erred in its analysis of the choice of law issue.
 
 
 18
 A district court in a diversity case must apply the law of the state in which it sits to a choice of law analysis. Klaxon Co. v. Stentor Elec. Mfg. Co., 313 U.S. 487, 496, 61 S.Ct. 1020, 1021-22, 85 L.Ed. 1477 (1941); Ledesma v. Jack Stewart Produce, Inc., 816 F.2d 482, 484 (9th Cir.1987). California's approach to choice of law questions focuses on the "governmental interest" of each state involved in the litigation. Ledesma, 816 F.2d at 484; Denham v. Farmers Ins. Co., 213 Cal.App.3d 1061, 1065, 262 Cal.Rptr. 146, 147 (1989). This approach has two prongs.
 
 
 19
 First, the court must determine whether there is a true conflict between the laws of the two jurisdictions on the issue presented by the litigation. Ledesma, 816 F.2d at 484; Offshore Rental Co. v. Continental Oil Co., 22 Cal.3d 157, 148 Cal.Rptr. 867, 583 P.2d 721, 723-25 (1978). There is no true conflict unless the laws of the two jurisdictions differ and both states have a legitimate interest in having their law apply. Ledesma, 816 F.2d at 484.
 
 
 20
 In the instant case, there is a clear conflict between the laws of California and New York: California allows a third party to recover from an attorney in situations where New York generally precludes it. Under California law, attorneys may be liable to a third party where the third party "was an intended beneficiary of the attorney's services, or where it was reasonably foreseeable that negligent service or advice to or on behalf of the client could cause harm to others." Fox v. Pollack, 181 Cal.App.3d 954, 960, 226 Cal.Rptr. 532, 535 (1986).
 
 
 21
 Under New York law, by contrast, attorneys are not liable to a party for economic injury arising from negligent misrepresentation unless there was privity between the injured party and the attorney, or unless there was "a relationship so close as to approach that of privity." Prudential Ins. Co. v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 590 N.Y.S.2d 831, 833, 605 N.E.2d 318 (1992). The New York courts have recognized a limited number of situations where an attorney can be held liable by a non-client.[5] In the absence of privity, or a relationship approximating privity, an attorney is not liable to a third party for actions taken in furtherance of his role as counsel. See Quintel Corp. v. Citibank, 589 F.Supp. 1235, 1240 (S.D.N.Y.1984); Calamari v. Grace, 98 A.D.2d 74, 469 N.Y.S.2d 942, 945 (App.Div.1983).
 
 
 22
 Once a court has established the existence of a true conflict between states, the court must apply the law of the state whose interest would be more impaired if its law were not applied. Ledesma, 816 F.2d at 484; Offshore Rental, 583 P.2d at 726. This analysis does not require the court to balance which state has the "better" social policy on the issue in question. Offshore Rental, 583 P.2d at 726. Rather, the comparative impairment analysis "attempts to determine the relative commitment of the respective states to the laws involved" by considering such factors as "the history and current status of the states' laws" and "the function and purpose of those laws." Offshore Rental, 583 P.2d at 727, Ledesma, 816 F.2d at 484. The court may also look to the reasonable expectations of the parties as to which state law would govern a dispute between them. Rosenthal v. Fonda, 862 F.2d 1398, 1402-03 (9th Cir.1988).
 
 
 23
 California's policy demonstrates a commitment to ensuring that lawyers who have not perpetrated fraud may be held liable by a third party for negligence if it was reasonably foreseeable that the third party would rely on the attorney's advice, or if the third party was an intended beneficiary of that advice. See Fox, 226 Cal.Rptr. at 535.
 
 
 24
 The policy behind New York's privity rule, on the other hand, is to ensure that attorneys will "be free to advise their clients without fear that [they] will be personally liable to third persons if the advice [they] have given to their clients later proves erroneous." D. & C. Textile Corp. v. Rudin, 41 Misc.2d 916, 246 N.Y.S.2d 813, 817 (Sup.Ct.1964).
 
 
 25
 We conclude that New York would suffer more if the court did not apply New York law to this case. Committed though California may be to its policy holding lawyers liable to third parties where it was foreseeable that the party would rely on the attorney's advice, California's ties to this lawsuit are weak. California's only ties to the suit are Waggoner, who was a California resident at the time of these events,[6] and Staar, which was incorporated in California before it was reincorporated in Delaware, and whose principal place of business apparently remained in California. The residence of the parties is not the determining factor in a choice of law analysis. See Rosenthal, 862 F.2d at 1402-03 (New York is the significantly interested jurisdiction where a California resident seeks out the services of a New York resident, licensed to practice only in New York, working out of a New York law firm, to enter into a contract which is "substantially performed" by the attorney in New York). The mere fact that California laws are more favorable to Waggoner's claim also cannot make California law controlling.
 
 
 26
 New York's interest in this litigation is significant because of its numerous contacts with the events giving rise to the litigation. In fact, the wealth of transactions and events which occurred in New York demonstrate that the reasonable expectations of the parties can only have been that New York law would apply to a dispute between them. See Id. Lutzker has been a New York resident since 1976. He has been licensed to practice law in New York since 1979, and he is a partner in a New York law firm. He has never been licensed to practice law in California. In addition, it was Staar which originally retained the New York firm of Bachner Tally for its corporate counsel and which decided to retain Lutzker as its corporate counsel when he left Bachner Tally to become a partner at Snow Becker. Neither Bachner Tally nor Snow Becker have ever had offices outside of New York. Moreover, almost all of the transactions relevant to this litigation took place in New York: Lutzker prepared the Certificate of Incorporation, reincorporating Staar in Delaware, in New York; the December 13, 1987 meeting of Staar's Board was held at Snow Becker's offices in New York; Lutzker prepared the Shareholders Agreement and the Certificate of Designation in New York; and each time Waggoner contacted Lutzker regarding these and other transactions, it was at Lutzker's office in New York.
 
 
 27
 New York has a clear interest in seeing that an attorney practicing in its jurisdiction, sought out by a foreign corporation and presiding over transactions brokered in New York, is covered by New York's policy that there must be a relationship at least approaching privity before an attorney can be held liable for his advice. See Id. Thus, the district court did not err by finding that New York law should apply to Waggoner's action.
 
 C. Summary Judgment
 
 28
 We must next determine whether the district court erred by granting summary judgment for the defendants. As noted above, New York law, with few exceptions, requires privity before a lawyer can be held liable by a party not his client in the absence of fraud, collusion, or a malicious or tortious act. "The fact that an attorney represents a corporation does not thereby make that attorney counsel to the individual officers and directors thereof." Stratton Group v. Sprayregen, 466 F.Supp. 1180, 1184 n. 3 (S.D.N.Y.1979).[7] On the contrary, attorneys are specifically required by the New York Code of Professional Responsibility, Ethical Consideration 5-18, to act in the interests of the entity they represent, rather than on behalf of the officers of that entity. See Quintel, 589 F.Supp. at 1240-41.
 
 
 29
 Unless the attorney for a corporation or partnership affirmatively assumes a duty toward an officer or partner, the lawyer is not liable to a partner or director who relied on his advice. Id. In the instant case, Lutzker's duty as counsel for Staar lay with the corporation, not with its officers and directors individually. In addition, the record reveals no sign that Lutzker affirmatively adopted Waggoner as a client during the transfer of preferred stock. Thus, the district court did not err by granting summary judgment for the defendants.[8]
 
 IV.
 CONCLUSION
 
 30
 The district court did not err by granting summary judgment for defendants because the record does not support Waggoner's assertion that Lutzker was his personal attorney. Further, the district court did not err by applying New York law to Waggoner's case pursuant to California's choice of law analysis. Finally, the district court did not err by granting summary judgment for the defendants because Waggoner did not present a triable issue of fact regarding whether Lutzker is liable to Waggoner as a third party. Thus, the defendants are entitled to summary judgment as a matter of law.
 
 
 31
 AFFIRMED.
 
 
 
 [1]
 Although this appeal is brought by both Thomas and Patricia Waggoner, we have followed the district court's practice of referring to Thomas Waggoner in the singular because resolution of Thomas Waggoner's claims also disposes of his wife's claims
 
 
 [2]
 At the time, Lutzker was a lawyer with the New York based firm of Bachner, Tally, Polevoy, Misher & Brinberg (Bachner Tally). In 1985, Lutzker left Bachner Tally in order to become a partner at Snow, Becker, Kroll, Klaris & Krauss, P.C. (Snow Becker), another New York based firm. Nevertheless, Lutzker retained his position as Staar's counsel. Lutzker and Staar apparently never signed a written retainer agreement
 
 
 [3]
 The Delaware Supreme Court found that the Board's transfer of preferred stock endowed with voting rights was invalid on the ground that it was ultra vires, or beyond the Board's powers, because Staar's Certificate of Incorporation did not expressly allow the Board to create a class of preferred stock with voting rights. The Delaware Supreme Court further found that Waggoner's attempt to convert one of his preferred shares into common stock was invalid. See Waggoner v. Laster, 581 A.2d 1127 (Del.1990); STAAR Surgical Co. v. Waggoner, 588 A.2d 1130 (Del.1991)
 
 
 [4]
 Waggoner initially contends that he and Lutzker had an on-going attorney-client relationship based on several instances in which he sought and received legal counsel from Lutzker on personal matters. As the district court properly pointed out, however, the issue here is whether Lutzker and Waggoner had an attorney-client relationship during the transactions giving rise to this malpractice suit: Lutzker's drafting and filing of the documents reincorporating Staar from California to Delaware, and Lutzker's drafting of the documents ostensibly transferring preferred stock to Waggoner in exchange for his personal guarantees. We need only focus on the transaction involving preferred stock, because all parties concede Lutzker was acting solely on behalf of Staar at the time Staar was reincorporated
 
 
 [5]
 See Jordan v. Lipsig, Sullivan, Mollen & Liapakis, 689 F.Supp. 192 (S.D.N.Y.1988) (summary judgment improper despite lack of privity between attorney and plaintiff where plaintiff's loss of consortium was due to attorney's failure to diligently prosecute plaintiff's wife's medical malpractice suit and was "completely foreseeable"); Cohen v. Goodfriend, 665 F.Supp. 152 (E.D.N.Y.1987) (holding in dicta that attorney may owe a fiduciary duty to non-client); Prudential, 590 N.Y.S.2d 831, 605 N.E.2d 318 (attorney owes duty of care to non-client third party when he prepares an opinion letter at client's behest, specifically for that third party); Baer v. Broder, 447 N.Y.S.2d 538 (App.Div.1982) (party who had retained attorney in her capacity as executrix of her husband's estate to handle wrongful death action could sue attorney for malpractice in her individual capacity); Schwartz v. Greenfield, Stein and Weisinger, 90 Misc.2d 882, 396 N.Y.S.2d 582 (Sup.Ct.1977) (plaintiff who loaned money to corporation could sue counsel who volunteered to file security agreement and did so improperly)
 
 
 [6]
 Waggoner and his wife apparently became Arkansas residents on August 20, 1991
 
 
 [7]
 Waggoner cites Stratton as support for his argument that Lutzker is liable to him as third party on the ground that the court in Stratton found that (1) the attorney in that case was representing both an officer of the corporation and the corporation and (2) establishing that relationship was enough to state a claim for negligence against the attorney. See 466 F.Supp. at 1186-87
 Stratton is distinguishable from the instant case, however. Here, Waggoner has not been able to establish an attorney-client relationship during the transfer of preferred stock by any means except his own allegations. In addition, the court in Stratton found only that the director had stated a claim sufficient to withstand dismissal. Id. Here, the district court did not dismiss Waggoner's complaint for failure to state a claim; rather, the court found that there was no genuine issue of material fact and that the defendants were entitled to judgment as a matter of law.
 
 
 [8]
 On appeal, Waggoner contends that Prudential expands the scope of liability for an attorney to a third party under New York law and that Lutzker is liable to Waggoner pursuant to the holding of that case. See 590 N.Y.S.2d 831, 605 N.E.2d 318. We need not determine the impact of Prudential on New York law, however, because the facts of Prudential are distinguishable from those in Waggoner's case. The court in Prudential found that a lawyer has a duty of care to a third party when the lawyer drafts an opinion letter at his client's direction, specifically for the third party to rely on. Id. In the instant case, although Lutzker drew up the documents effectuating the alleged transfer of preferred stock to Waggoner at the direction of Staar, his client, there is no evidence that Waggoner was the intended beneficiary of those documents. Lutzker drew them up specifically for his client. He had no reason to believe that Waggoner would rely exclusively on the documents he drafted for Staar, particularly in light of the fact that Lutzker had announced at the Board meeting on December 13, 1987 that he was there as counsel to Staar and not to Waggoner