[693 NYS2d 544]

Etude Tajan et al., Respondents-Appellants, v Pavia & Harcourt et al., Appellants-Respondents.

First Department, July 8, 1999

### APPEARANCES OF COUNSEL

*Jay R. Butterman* of counsel (*Howard A. Gardner* on the brief; *Butterman, Kahn & Gardner, L. L. P.,* attorneys), for respondents-appellants.

*Peter A. Stroili* of counsel (*Robert E. Kushner* on the brief; *D'Amato & Lynch,* attorneys), for appellants-respondents.

### OPINION OF THE COURT

TOM, J. P.

The issue in this case is whether the attorney administrator of an estate can be held liable for an opinion letter stating that there were no claims against a valuable Italian painting belonging to the estate when a foreign government subsequently accused the estate of transferring the estate's property in violation of national law prohibiting the extranational sale of precious cultural objects.

The Old Master painting that is at the center of this case is "A Capriccio with a Domed Church and Buildings in Las Pirna" by the 18th century Italian artist Bernardo Bellotto. Bellotto's "Capriccio" was owned by Enzo Colombo. It, and other works of art, were reported stolen from Colombo's villa in Florence, Italy, in 1981, and international notice was provided by a 1982 Interpol bulletin. The owner died in 1984, survived by his wife, Lucia Giacalone, and three children from a prior marriage, Davide, Annita and Sara Colombo. Although he left a will, he was intestate as to this painting.

In 1985, the painting reappeared and was placed for auction with Christie's in New York, but was seized by the United States Customs Service pursuant to international letters rogatory of the Italian government and turned over to the United

States Attorney's office for the Southern District of New York. The owner's heirs then commenced a turnover proceeding in New York County Surrogate's Court. In 1987, defendant Douglas Lehman, a partner at defendant law firm Pavia & Harcourt, was appointed by the Surrogate to be the ancillary administrator of the owner's United States estate, consisting only of the painting. By order to show cause, the defendants notified the Italian government of the recovery of the painting and of the proceeding, seeking cause why the painting should not be turned over to Lehman as ancillary administrator of the estate. It is undisputed that the Italian government declined to intervene. As a consequence, Lehman took possession of the painting for the benefit of the heirs in 1987.

Over the course of the next 10 years, Lehman obtained releases from Lucia Giacalone, the owner's wife, and from Sara and Annita Colombo, so as to vest sole title of the painting in Davide. There was no indication as to what consideration Lucia or Sara received for releasing their rights to the painting, but Annita was paid $200,000. Annita agreed, in exchange for a payment of $200,000 to be realized from the painting's anticipated sale proceeds, to relinquish to Davide her rights in the painting.

On January 13, 1997, Davide Colombo executed a receipt and release in connection with Lehman's relinquishment of the painting to Davide, using Tulip Enterprises, Ltd. as the transfer agent. Annita's signature on the release executed by her was apparently not authenticated until January 27, 1997, but it is not seriously contended that she had not signed it.

To assure plaintiff Wombaca, which was negotiating for the purchase of the painting, of Davide's good title to the painting, defendant Pavia & Harcourt issued an opinion letter dated that same day, addressed "to Whom It May Concern", stating that the painting: "was distributed by Douglas Lehman, as Ancillary Administrator of the U.S. Estate of Enzo Colombo, to Tulip Enterprises S.A., on instructions received from all of the distributees of the aforesaid estate, i.e. the legal heirs of Enzo Colombo. During the period of Estate administration, i.e. from 1987 to today's date, no claim has been asserted or lien imposed, or attempted to be imposed, on the painting."

On January 13, 1997, the same day as the transfer to Tulip Enterprises, the painting was sold to plaintiff Wombaca for $1.1 million after Wombaca had inspected and authenticated the painting. Wombaca is a Panamanian corporation in the business of purchasing rare works of art.

The bill of sale executed by Davide on behalf of Tulip Enterprises warranted the painting's good title. Notably, the motion court found that there was no evidence that defendants had warranted good title, with which we agree. The bill of sale also stated that disputes would be resolved under the law of the United States. Wombaca's check was sent by Pavia & Harcourt to a Swiss bank and deposited into an escrow account with irrevocable instructions by Davide, as agent for Tulip Enterprises, to release $200,000 to Annita as soon as the funds were available to Tulip Enterprises. This explains Annita's appearance in the bank on January 27, 1997, where she executed a release and receipt acknowledging her receipt of $200,000, which she stated to be her share, as an heir, of the painting.

During the spring of 1997, Wombaca consigned the painting to plaintiff Etude Tajan, a French auction house, which anticipated a sale price in excess of $3 million, for which its commission would be 25%. The auction was scheduled for the evening of June 17, 1997. At 10 o'clock that morning, Lucia reported to the Italian police that she had just learned the prior evening about the auction, and that the painting had been stolen from her house in 1981 and reported stolen by her deceased husband. Acting on that information, the Italian police contacted French authorities, faxing a copy of the original Interpol notice of theft, who then seized the painting. However, the eventual basis for the Italian government's confiscation of the painting was its illegal export, and not that it was stolen. The seizure cancelled the auction, jeopardizing Wombaca's investment in the painting, and costing Etude Tajan its commission.

■■ Plaintiffs commenced an action against the estate's administrator and his law firm, and advanced a single claim in the complaint that by virtue of the allegedly inaccurate opinion letter, defendants were liable to them for negligent misrepresentation. Defendants moved to dismiss the complaint under CPLR 3211 (a) (1), (3) and (7). Plaintiffs cross-moved to add a breach of warranty claim to the complaint and for leave to replead in the event the complaint was dismissed. The motion court, correctly, dismissed the complaint with regard to plaintiff Etude Tajan, finding no basis to conclude that it was a party known to defendants or even a party likely to rely on defendants' letter (*Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood*, 80 NY2d 377). The court also, correctly, denied the cross motion to add a claim sounding in breach of warranty, insofar as Wombaca had submitted no evi-

dence in support of the cross motion that defendants had warranted good title. The court found triable issues, though, regarding why the painting was seized, ostensibly supporting the negligence claim by plaintiff Wombaca, whose investment in the painting was lost upon the seizure.

However, since the issue is not whether Davide might have violated an Italian regulation, discussed *infra*, by the method of his sale to Wombaca, but whether defendants diligently and accurately communicated the steps to ensure good title until the time Tulip Enterprises took custody of the painting, plaintiff Wombaca failed to state a cause of action. Additionally, as will be noted *infra*, the defense was proved at the outset on the basis of documentary evidence. As such, we modify and dismiss the complaint in its entirety.

Attorneys, like other professionals, may be held liable for economic injury arising from negligent misrepresentations (*Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood, supra*). In order to establish a cause of action for negligent misrepresentation by a professional, the plaintiff must demonstrate defendant's awareness that its report or opinion is intended to be used for a particular purpose, that plaintiff relied on that statement in furtherance of the purpose, that defendant understands that reliance, that the report or opinion contains a misrepresentation, and that the plaintiff suffers damage as a consequence of its reliance on the misrepresentation (*Credit Alliance Corp. v Andersen & Co.*, 65 NY2d 536). Although defendants owed a duty of care to Wombaca, there were no misrepresentations, and no breach of that duty (*Prudential Ins. Co. v Dewey, Ballantine, Bushby, Palmer & Wood, supra*). Plaintiffs rely heavily on defendants' representation that there were no liens or claims, noting that a claim was asserted; therefore, in their argument, the representation was inaccurate. However, this construct does not follow from the facts. The letter stated that there were no claims or liens from 1987 until January 13, 1997. That was accurate. At the time the opinion letter was issued, it was undisputed that the late Enzo Colombo had title to the "Capriccio", defendants had already obtained releases from Colombo's heirs and there were apparently no claims made by anyone against the painting. Moreover, to the extent that Lucia originally had a claim as an heir, that claim was extinguished with the release that she signed.

Plaintiffs contend that Lucia's release was defective in various respects, but the validity of the documentation is amply

demonstrated in the record. The execution of Lucia's release was made pursuant to proper protocol and Lucia, herself, is not challenging the validity of her release. In 1992, Lucia executed an acknowledgment of assignment, waiver and release in person before a United States Consul in Italy. The standard form release sets forth that the releaser was acting in order to facilitate the administration of the United States estate, the sole asset of which was the painting; she acknowledged receiving consideration, although the nature of the consideration is unspecified and for all practical purposes remains undocumented. Specifically, the document reflects her attestation that she "waived any right, title, interest or claim against [the] U.S. estate." She waived any beneficial interest as heir or creditor of the painting, and, further, agreed to hold Lehman harmless in connection with "the administration and distribution of the U.S. estate * * * in accordance with the instructions of the heirs without further notice". The release, though specifying that she transferred all of her rights in the painting, left blank the identity of the transferee.

Plaintiffs complain that the transferee was unidentified; they argue that there is no indication that she understood what she was executing, or whether she actually received consideration. The latter point seems to have, at best, marginal relevance to the validity of the release, and plaintiffs' speculation about Lucia's cognitive awareness of what she was signing remains, at best, just speculation. As to the unidentified transferee, since there is no dispute among putative transferees, and Lucia clearly waived further personal rights in the painting, it is not clear how the mere fact of the blank would vitiate the validity of the release. It is clear based on the documentation that her intention was to waive her interest in the painting. Plaintiffs did not submit an affidavit from Lucia or other evidence raising a triable issue.

Lucia's action in informing Italian authorities that a stolen painting was to be auctioned, motivated by whatever unknown reason, did not constitute a claim. Initially, her statement to Italian authorities postdated defendants' opinion letter, so that in terms of timing, it does not put the lie to the letter. Moreover, her statement does not assert any claim that is inconsistent with defendants' opinion letter. Although plaintiffs speculate that she must have intended to make a claim, in fact, she did not. All she stated to the Italian authorities was that the subject painting was stolen from their house in Italy in 1981. Elsewhere, plaintiffs contend that "Lucia unquestionably

disputed that she had instructed [defendants] to distribute the painting, when she went to the Italian police and claimed the Painting had been stolen and not recovered" but, whatever else may be surmised from her action, plaintiffs' premise is highly questionable and does not follow from the apparent incompleteness of the events she communicated in her statement. Lucia merely stated that the painting had been stolen in 1981. The fact that, by omitting mention of the painting's recovery, Lucia may have made her own misrepresentation, does not convert her statement to a claim resulting in a misrepresentation by defendants, especially when such statement was communicated after the release of the opinion letter.

Plaintiffs' brief also makes the most of possible defects in releases signed by various heirs. However, this is not a Surrogate's proceeding; that same court noted no evidence that those heirs contested title and there does not appear to be a pending challenge by an heir to the disposition of the estate property.

As for the validity of defendants' own reliance on the releases, particularly Lucia's, we have previously noted the importance with which we treat such instruments, reflecting their utility for avoiding or settling disputes. In view of the jural consequences of executing a release, we require that a challenging party establish duress, illegality, fraud or mutual mistake (*Mergler v Crystal Props. Assocs.*, 179 AD2d 177), factors having no support in this case. We have even upheld releases when the releasor was unaware of a potential legal claim being waived by the release (*supra*). The principle, that to hold a release forever hostage to legal afterthoughts basically vitiates the nature of the release, particularly applies here. While attorneys preparing releases for clients have long been held to a higher standard of demonstrating the absence of fraud (*Whitehead v Kennedy*, 69 NY 462, 466), as are fiduciaries (*cf.*, *Matter of O'Hara*, 85 AD2d 669, 671), there is no support in this record for a claim that Lucia was defrauded by defendants when she signed her release. Plaintiffs presently suggest that "apparently, Lucia Giacalone is now denying the effect or existence of her Release," but no attribution is provided for the suggestion. It bears repeating here, too, that, but for plaintiffs' unsupported speculation, there is no affidavit from Lucia, the supposedly defrauded party, or, indeed, any other information in the record that evinces fraud in the making of her release. We are left only with a release that, while its intent is clear, may or may not have facial technical defects;

however, such defects do not amount to fraud. Hence, the presumption of regularity should govern the waiver to which she assented in signing the release.

Lucia's complaint might have been the precipitating cause of the seizure. However, Italian authorities had an interest in causing the seizure of the painting that was separate from the issue whether or not the painting had been stolen. That interest was to ensure the return of an Italian cultural treasure to within its national boundaries. By international letter rogatory dated July 22, 1997, the Office of the Public Prosecutor of Florence provided a more detailed postreturn history of the painting, now indicating that Italy's interest was in Davide's sale of an Italian cultural property outside of Italy, constituting a criminal offense under Italian law. The offense, known to the Italian authorities as of May 13, 1997—that is, well before the scheduled auction date and before Lucia's complaint—in this case was alleged to be Davide's failure to return the painting to Italy. The punishment for the offense, according to the letter rogatory, was confiscation of the painting, a fine equivalent to the value of the painting levied against the party that illegally exported the painting, an additional fine, and incarceration. This document made clear that Italian authorities knew that the stolen painting had been recovered and that an administrator for the estate had been appointed to dispose of it.

█ Aside from getting some of the jurisdictional and procedural aspects of the history wrong, the July 22, 1997 document indicated that Italian authorities had tried to ensure the painting's return to Italy but were prevented from doing so by the Surrogate's proceeding; that contention, of course, is at odds with the order to show cause which invited the Italian government to intervene, and the failure of Italian authorities to respond. Hence, the June 17, 1997 communication from the Italian prosecutor to French authorities requesting seizure of a purportedly stolen art work seems, at best, disingenuous. This July 22, 1997 letter rogatory also was the first notice that ownership of the painting—Wombaca's, not Davide's, ownership—might be challenged on the basis of illegal export rather than on the chain of title. The offense, then, regarded Davide's lawful right to sell the painting outside of Italy, and not his lawful ownership of it, a critical distinction for this case. Notably, nothing in this document materially contradicted the defendants' January 13, 1997 letter in issue describing steps taken to ensure good title, nor the fact of the valid chain of title until that date, when defendants were relieved of their re-

sponsibilities. In any event, since there is no persuasive documentation in the record reflecting defective title, and since defendants' role was, by their appointment, limited to ensuring the orderly transfer of estate property from decedent to lawful heirs, and not to ensure compliance with Italian cultural regulations, the discharge of their responsibilities bears no connection with the seizure of the painting.

Accordingly, the order of the Supreme Court, New York County (Elliott Wilk, J.), entered November 13, 1998, granting in part and denying in part defendants' motion to dismiss the complaint and denying the cross motion to, *inter alia*, amend the complaint, should be modified, on the law, to dismiss the complaint in its entirety and otherwise affirmed, without costs. The Clerk is directed to enter judgment in favor of defendants-appellants-respondents dismissing the complaint.

MAZZARELLI, LERNER and BUCKLEY, JJ., concur.

Order, Supreme Court, New York County, entered November 13, 1998, modified, on the law, to dismiss the complaint in its entirety, and otherwise affirmed, without costs.