■ In the Matter of KEVIN AOKI et al., Petitioners, v ECHO AOKI et al., Respondents, DEVON AOKI et al., Appellants, and KEIKO ONO AOKI, Respondent. [985 NYS2d 523]—

Decree, Surrogate's Court, New York County (Rita Mella, S.), entered March 5, 2013, after a nonjury trial, invalidating two partial releases of a power of appointment executed by decedent Rocky Aoki, and bringing up for review an order, same court (Kristin Booth Glen, S.), entered April 27, 2010, which, insofar as appealed from, denied the motion of respondents-appellants Devon Aoki and Steven Aoki for summary judgment declaring said releases valid, based on the alleged constructive fraud of Rocky's attorneys, unanimously reversed, on the law, without costs, the decree vacated, the motion granted, and it is declared that the releases are valid.

In 1998, decedent Rocky Aoki, the founder of the Benihana restaurant chain created the Benihana Protective Trust (BPT) to hold stock and other assets relating to Benihana. The BPT trust agreement gave Rocky the power to appoint the beneficiaries of the BPT through his will. He selected as trustees of the BPT two of his six children (petitioners Kevin Aoki and Kana Aoki) and his longtime attorney, Darwin C. Dornbush.

In July 2002, Rocky married respondent Keiko Ono Aoki. A few months later, Kana and Kevin met with Dornbush to express their concern that their father did not have a prenuptial agreement. Dornbush advised them that a postnuptial agreement would resolve their concerns. Rocky discussed this issue with Keiko but she refused to consent to such an agreement. Rocky thereafter met with Dornbush, Kevin and Kana to discuss their concerns regarding possible claims by Keiko against Benihana assets in the event of Rocky's death.

Norman Shaw, Dornbush's partner and an attorney experienced in estate work, recommended that Rocky could partially release his power of appointment under the BPT agreement so that he could appoint only to his descendants or trusts for his descendants, thereby restricting Benihana assets to members of his direct family. Rocky, Kana and Kevin again met with Dornbush on September 23, 2002 and they reviewed what Dornbush characterized as a "close to final draft" of the partial release. The following day, Rocky met with all three again and signed the one-page document captioned "Partial Release of power of Appointment Under New York Estates, Powers & Trusts Law § 10-9.2." The pertinent terms of the release are: "I hereby irrevocably partially release the power of appointment [in Article V (a) of the BPT agreement] so that, from now on, I shall have only the following power: I shall have a testamentary power to appoint any of the principal and accumulated net income remaining at my death to or for the benefit of any one or more of my descendants."

Rocky's relationship with his children began to deteriorate and reached the point where he commenced litigation against them and Dornbush in their capacities as trustees of the BPT. At his deposition in that litigation, Dornbush testified that he explained to Rocky that upon signing the release, disposition of the Benihana assets would now be limited to his children and their descendants, whereas before his appointment powers were unlimited. In that same action, Rocky testified that Dornbush just told him "sign here." However, both Rocky and Shaw testified that Shaw explained that the effect of the release was that Rocky could appoint only to his descendants. It is also undisputed that Rocky had sufficient opportunity to read the one page release before signing it. On the same day that he signed the release, Rocky signed a codicil to his will and a consent to an amendment to the BPT agreement.

Because of a change in IRS regulations concerning bequests to nonresident aliens, Shaw prepared a "Further Partial Release of Power of Appointment Under New York Estates, Powers & Trusts Law § 10-9.2" to cover that eventuality. This second release again provided that Rocky was "irrevocably" partially releasing his power of appointment under the BPT agreement, restricting his power to appoint only to his descendants, provided that they were not nonresident aliens. Rocky was given the opportunity to read this release before he signed it on December 27, 2002.

On August 4, 2003, Rocky executed a codicil which purported to exercise his power of appointment, giving 25% of the BPT

outright to Keiko, and the income from the remaining 75%, to her for her lifetime. It also gave her the power to appoint the principal to one or more of Rocky's descendants in her will, and designated her as the executrix. The codicil was drafted by Keiko's regular counsel, Joseph Manson.

Manson thereafter wrote to Dornbush, advising him of the provisions of the codicil. He advised Dornbush that, at Rocky's suggestion, the two should meet to discuss the will "and other matters concerning the Aoki family." At their meeting, Manson asked Dornbush for an opinion from his firm as to whether Rocky's purported exercise of his power of appointment in the codicil was valid. On September 8, 2003, Shaw responded, opining that the portion of the codicil giving Keiko a beneficial interest in the BPT was invalid because the partial release signed by Rocky rendered Keiko an impermissible appointee of the trust. On September 22, 2003, Rocky executed an affidavit in which he stated that he did not understand that by signing the releases he could not leave his Benihana stock to anyone he chose through his will. He further stated: "If I had known that these documents prevented any changes to the disposition of my stock, I never would have signed the documents." The purpose of preparing this affidavit is unclear, in light of the fact that at no time prior to his death in July 2008 did Rocky take any steps to declare the releases invalid, or otherwise challenge their execution.

In fact, on September 7, 2007, almost four years after executing that affidavit, Rocky executed a new last will and testament. In it, he again purported to exercise his power of appointment in the same manner as in his August 3, 2004 codicil. However, he added: "In the event that it is finally determined that the [above] exercise of my power of appointment . . . is invalid because, contrary to my wishes, the [September and December 2002 partial releases] are found to be valid, . . . I hereby exercise said power fifty percent . . . in favor of DEVON AOKI, . . .and fifty percent . . . in favor of STEVEN AOKI."

In February 2009, the trustees of the BPT brought this action to determine the validity of the partial releases. Devon and Steven answered. Keiko answered and asserted affirmative defenses, claiming, inter alia, that the proposed releases "are invalid as they are the product of fraud or were obtained through fraudulent devices."

After discovery was conducted, Devon and Steven moved for summary judgment to dismiss Keiko's affirmative defenses and to declare the releases valid. The Surrogate granted the motion in part and denied it in part, finding that Keiko had raised a tri-

able issue of fact as to her affirmative defense of constructive fraud. After a bench trial, although the Surrogate found that Keiko had adduced no direct evidence that Rocky was unaware that the releases were irrevocable, the court held that the circumstantial evidence was sufficient to meet Keiko's burden and that Devon and Steven failed to meet their burden of proving that Rocky's signing of the releases was voluntary and not the result of omission by his counsel. The Surrogate declared the releases invalid. We now reverse.

The principles underlying the concept of constructive fraud are of long-standing duration: "It may be stated as universally true that fraud vitiates all contracts, but as a general thing it is not presumed but must be proved by the party seeking to relieve himself from an obligation on that ground. Whenever, however, the relations between the contracting parties appear to be of such a character as to render it certain that they do not deal on terms of equality but that either on the one side from superior knowledge of the matter derived from a fiduciary relation, or from an overmastering influence, or on the other from weakness, dependence, or trust justifiably reposed, unfair advantage in a transaction is rendered probable, there the burden is shifted, the transaction is presumed void, and it is incumbent upon the stronger party to show affirmatively that no deception was practiced, no undue influence was used, and that all was fair, open, voluntary and well understood. This doctrine is well settled." (*Cowee v Cornell*, 75 NY 91, 99-100 [1878]; *Matter of Gordon v Bialystoker Ctr. & Bikur Cholim*, 45 NY2d 692, 698-699 [1978]).

"To avoid a release on the ground of fraud, a party must allege every material element of that cause of action with specific and detailed evidence in the record sufficient to establish a prima facie case" (*Shklovskiy v Khan*, 273 AD2d 371, 372 [2d Dept 2000]). "In the absence of a fiduciary relationship between the parties to the release, the party seeking to avoid the release bears the burden of proving such fraud or other vitiating circumstances" (*Matter of O'Hara*, 85 AD2d 669, 671 [2d Dept 1981]). Moreover, a release should "not be treated lightly" and "should never be converted into a starting point for renewed litigation" except in cases of "grave injustice" and then, only under "the traditional bases of setting aside written agreements" (*Touloumis v Chalem*, 156 AD2d 230, 231 [1st Dept 1989]).

Keiko relies on the fiduciary exception to support her contention that the releases are invalid. However, for constructive fraud to apply, the fiduciary must be a party to or have an inter-

est in the subject transaction (*O'Hara,* 85 AD2d at 671). Here, neither Dornbush nor Shaw were parties to the releases and thus could not benefit from them. The Surrogate therefore erroneously shifted the burden of proof to Devon and Steven to prove that the releases were *not* procured by fraud.

The record does not support the claim that the releases are invalid because Rocky did not understand that he was irrevocably relinquishing his power to appoint the BPT assets to any person as he saw fit. Rocky's later allegations that he was not aware he was signing an irrevocable waiver, that he did not read the document and did not understand it are not sufficient to set aside the releases. There is no evidence in the record that either Dornbush or Shaw ever represented to him that the waivers were anything but irrevocable, or misled him regarding their effect. There is nothing to indicate that the attorneys either concealed from or did not affirmatively provide Rocky with any information he needed to make an informed decision. In fact, despite his later disclaimer, Rocky testified at his deposition that Shaw did explain the effect of these waivers. The attorneys thus took all reasonable efforts to apprise Rocky of the effect of what he was signing. It is uncontested that Rocky had ample opportunity to read the documents and ask any questions regarding them. He chose not to do so, not once, but twice.

It is well established that a "party who signs a document without any valid excuse for having failed to read it is conclusively bound by its terms" (*Shklovskiy v Khan,* 273 AD2d at 372; *Morby v Di Siena Assoc.,* 291 AD2d 604, 605 [3d Dept 2002]). The record is devoid of any excuse, let alone a valid excuse, for failing to read the release prior to signing it (*see Davis v Rochdale Vil., Inc.,* 109 AD3d 867 [2d Dept 2013]). Nor does the record support the allegations that Rocky did not understand the waivers because they were in English. To the contrary, the record clearly demonstrates that Rocky was fluent in English, conducted his business affairs in English and gave his deposition in English. In any event, a claimed unfamiliarity with the English language will not support a claim of fraud where the proponent fails to demonstrate any efforts to have someone read and explain a document to him or her before signing it (*Shklovskiy,* 273 AD2d at 372; *Flusserova v Schnabel,* 92 AD3d 464, 465 [1st Dept 2012]). This is a commonsense principle, for "to hold a release forever hostage to legal afterthoughts basically vitiates the nature of the release" (*Tajan v Pavia & Harcourt,* 257 AD2d 299, 306 [1st Dept 1999], *lv dismissed and denied* 94 NY2d 837 [1999]).

Most significantly however, it is undisputed that from at least

the August 4, 2003 codicil, and most likely before, Rocky was aware that he signed irrevocable waivers. At no point did he make any attempt to have those waivers declared invalid, thereby calling into question his later allegations that the waivers did not represent his wishes. Accordingly, the releases should have been given effect and the Surrogate's Court should have granted the motion for summary judgment.

In light of the foregoing, we need not reach appellants' remaining contentions. Concur—Sweeny, J.P., Renwick, Moskowitz, Richter and Gische, JJ.