van Gestel, J.
This matter is before the Court after a jury-waived trial on the merits. The Court’s findings of fact, rulings of law and an order for judgment follow. Mass.R.Civ.P. Rule 52(a). Nessralla v. Peck, 403 Mass. 757, 760 (1989).
The plaintiffs Dean Foods Company, Suiza GTL, LLC, Dean Northeast, LLC, and West Lynn Creamery, Inc. are all now corporately related in a manner that has no substantive effect on this case. Unless greater specificity is needed, they hereafter collectively will be called “WLC.” However, since much of what is involved in this case relates specifically to West Lynn Creamery, Inc., it will hereafter be called “West Lynn Creamery.”
*599 There has been a resolution before trial of all claims against the following: Arthur J. Pappathanasi (“Pappathanasi”), individually and as Trustee; Nicholas Scangas, individually and as Trustee; Christopher Scangas, individually and as Trustee; and 330 Scangas Nominee Trust. The defendants that remain and are the subject of these findings and rulings are the law firm of Rubin and Rudman, LLP (“Rubin and Rudman”) and three men who at material times were partners of that firm: Michael L. Altman (“Mr. Altman”), Gene T. Barton (“Mr. Barton"), and Charles J. Speleotis (“Mr. Speleotis").
FINDINGS OF FACT
West Lynn Creamery was a long-time client of Rubin and Rudman. Mr. Speleotis was the originating partner on the West Lynn Creamery account. As such, Mr. Speleotis reviewed essentially all of the Rubin and Rudman invoices to West Lynn Creamery before the bills were sent out.
In early October 1997, West Lynn Creamery received a federal grand jury subpoena seeking any and all records relating to payments made by West Lynn Creamery to Michael Gavriel and Cathy Gavriel (the “Gavriels”) or to any entities owned by, operated by or affiliated with the Gavriels. The Gavriels and their entities ran certain Dunkin’ Donuts franchises and as such were customers of West Lynn Creamery. The subpoena called upon West Lynn Creamery to produce:
Any and all records of West Lynn Creamery, Inc. for payments made to Michael Gavriel, Cathy Gavriel, Bostonian Bakery and Café Corporation of America, Inc., Federal Foods, Inc., Gavriel Foods, Inc., Gav-Stra Donuts, Inc., K.A.C.Y. Corp., Lampy Corporation and Mica Corporation and any other business owned by, operated by or affiliated with Michael Gavriel or Cathy Gavriel for the period January 1, 1990 to the present to include the documents listed on Attachment A.
Attachment A to the subpoena also required West Lynn Creamery to produce the following documents related to the Gavriels or their entities: (1) records of any contracts, agreements and meetings; (2) all invoices, sales journals, accounts receivable journals, cash receipt journals, accounts payable journals, cash disbursement journals, summaries, original cancelled checks, and any other form of payment; (3) work papers (including accountants work papers); and (4) all correspondence, notes and memoranda.
On October 16, 1997, Rubin and Rudman was retained by West Lynn Creamery to represent it in connection with the grand jury subpoena. Mr. Altman was the Rubin and Rudman partner responsible for the legal services provided to West Lynn Creamery in connection with the grand jury subpoena.
Rubin and Rudman opened a new billing matter for West Lynn Creamery. It was numbered 01869-48 and was entitled “CriminalRebate Investigation.”[4] Mr. Altman then set about to learn what he could about the rebate program. His efforts and actions follow.
By letter dated October 30, 1997, Mr. Altman delivered certain documents responsive to the grand jury subpoena to Assistant United States Attorney John M. Hodgens, Jr. (“AUSA Hodgens”).
By letter dated November 2, 1997, AUSA Hodgens informed Mr. Altman that West Lynn Creamery’s response to the grand jury subpoena did not appear to be complete, and that West Lynn Creamery was expected to produce a keeper of records, together with the remainder of the records called for in the subpoena, before the grand jury on November 6, 1997. AUSA Hodgens also asked Mr. Altman to clarify, in writing, the names of the individuals and entities that he represented.
On November 7, 1997, Mr. Altman wrote a memorandum to the file summarizing a November 3, 1997, interview of Ed Beaulieu, a West Lynn Creamery employee. This memorandum states:
On November 3, 1997, I spoke with Ed Beaulieu about West Lynn’s rebate programs. He said that he had no particular conversations that he could remember with anyone at West Lynn about the rebate program. He said the program had been in effect since 1981 when he first began working for West Lynn. He said that he thought the person who set up the program was Bob Walsh.
I asked Ed what he knew about the Dunkin Donuts rebate program. He said he didn’t know a lot except that the salesmen delivered the rebate checks at some point during the month, and that the program was a pain in the neck. He said that the rebate program was established to serve a legitimate purpose. He said that when the salesmen delivered their checks each month, it was an excuse to visit the customer location, to see whether everything was in order, and whether the customer’s needs were being met. One of West Lynn’s concerns for the past four or five years was that its customers use the coolers for proper purposes. West Lynn did not want other vendors putting their products in West Lynn coolers. Therefore, by visiting the site on a monthly basis, the salesmen would be able to confirm the proper use of the cooler. In addition, the salesmen would be able to chat up the customer to determine whether they had any other needs or problems. Ed felt that the program was nonetheless a pain in the neck because it was another step in the process that invited possibilities of issues arising. If, for example, there is a question about the amount of a rebate check or whether the rebate check was delivered, that is a source of difficulties. He said that West Lynn is moving away from the rebate program.
*600 Ed said that he had no knowledge of any funny business by any customers with respect to the rebate checks, and he didn’t know the Gavriels. He asked me what was going on, and I told him that I didn’t want to tell him. He also asked what I meant by “funny business” and I said that I also wasn’t going to fill in the details for his imagination on that subject.
On November 6, 1997, Jim Walsh, Sales Development Manager at West Lynn Creamery, told Mr. Altman that rebates were sometimes paid to customers in cash. According to Mr. Altman’s interview memorandum with Walsh:
Jim cashed checks for about 10 owners. They never gave their reasons for cashing checks.
Jim has mentioned to Nick [Scangas) about cashing checks. For example, an irate owner called about 7 or 8 years ago looking for his rebate. Nick wanted to know what was going on. Jim told Nick that the other owner received the rebate in cash. Nick said nothing.
Some customers cashed their checks every month; some once in a while. Jim never knew why customers wanted cash.
According to another of Mr. Altman’s interview memoranda, Nicholas Scangas, West Lynn Creamery’s Executive Vice President of Sales, said the following.
Originally, Dunkin’ Donuts owners were entrepreneurs with only a little money. They would come to West Lynn Creamery and ask for a loan. West Lynn could then arrange for a loan with the Credit Union [the Community Credit Union of Lynn] but the Credit Union wanted a guarantee. West Lynn was willing to provide the guarantee only because it could insure payment through rebates.
CashJim Walsh mentioned a long time ago that a customer asked him to cash checks. He told Nick because Nick is his boss. Nick had no knowledge of why customer [sic] would want cash. He said he didn’t like the idea but Jim said that the customer (Carlos Andre) insisted. Nick doesn’t like cashing checks because that can lead to disputes about whether the cash was received, etc.
On November 19, 1997, Mr. Altman had a telephone conversation with James M. Merberg (“Mr. Merberg”), a criminal defense lawyer representing Michael and Cathy Gavriel, the Dunkin’ Donuts franchisees identified in the grand jury subpoena. During the conversation with Mr. Merberg, Mr. Altman suggested that their conversation would be subject to a joint defense agreement. Mr. Altman’s November 20, 1997, memorandum to the file reads:
The Gavriels are represented by an attorney named James Merberg. His address is 66 Long Wharf, Boston 02110. His telephone number is 723-1990. He called me on November 19, 1997. I assume he called me after Brenda spoke with the Gavriels.
Merberg was mildly hostile. He basically felt that West Lynn and his clients had committed various crimes, including income tax evasion and commercial bribery. Merberg understood that West Lynn Creamery controlled the Credit Union, and its president was also president of West Lynn. He suggested that it was West Lynn’s decision to have the Gavriels obtain the loan. He thought the entire transaction smelled, and he was suggesting that West Lynn was bribing the Gavriels in order to retain the business of their Dunkin Donuts.
I told Merberg that he had a distorted view of the situation. I said that it was only West Lynn’s goal to help its customers. I said that I had no knowledge of why the Gavriels wanted a loan, but I am sure that if they did, because of the longstanding family relationship between the Gavriels/Karas and West Lynn, that West Lynn would be as helpful as possible so that the Gavriels could obtain a loan for their Dunkin Donuts. Merberg resisted this scenario, and wouldn’t share with me all of the details that he had. He realizes that his clients, particularly Mrs. Gavriel, had committed tax evasion, and it is a difficult situation.
It should be noted that Merberg said that he represented both Gavriels “for now.” I asked him what he meant by that and he said that for now there was no conflict, but he didn’t know how that would play out in the context of this case. He said he might end up only representing Mrs. Gavriel.
Merberg said that he could not see any legitimate reason for West Lynn to be paying rebates. I told him a little bit about the history and the present rationale, and he conveyed that he thought that was a crock.
Merberg and I talked with the agreement that that conversation would be subject to a joint defense agreement. He said that he expected that we would have to part company soon. That may mean that he is going to try to get his clients to testify against West Lynn in exchange for a deal. I told him that this case looked to me as follows:
First, it looks as if the government may have a tax evasion case against the Gavriels. I said that West Lynn had no role to play in that case, but if anyone was going after anyone else for commercial bribery, then the alleged payer and payee of the bribe had a mutual interest in cooperation. I said that furthermore, it seemed to be in neither party’s interest to get roped in on a false statement charge, based upon what one says that the other does. Merberg was very skeptical about whether we could work out any kind of joint defense agreement or that he could share any information from his client. He said that he would be in a better position to know at the end of the week.
*601 Merberg said several times that he believed that West Lynn took out loans for its customers. He made it sound as if West Lynn was the initiator of the loan. He wouldn’t tell me his basis for that belief. He also said that West Lynn was paying a fixed amount each month of principal and interest on the loan. I told him that I believed we were only paying the rebate amount each month and that I believed that the rebate amount varied each month depending upon the amount of product that was purchased.
Merberg told me that subpoenas had been issued to each of the entities owned by the Gavriels to produce documents. I told him that West Lynn had received a document subpoena as well. Merberg said that the name of the investigator that was snooping around was named George Neal.
At this stage, Merberg is not terribly well versed in the facts. My goal is to try to persuade him that this was a transaction that was done because the customer wanted it done that way. I think I softened him up a little bit but I also believe that he thinks that West Lynn may have been receiving a kickback out of the “supposed” loan from the Lynn Credit Union. I put the word “supposed” in quotes because Merberg doesn’t think that there was a real loan here to the customer, but rather that there was a kickback scheme in which, in order to do business with West Lynn, West Lynn told the customer to take out a loan from the Credit Union, gave the customer all of the documents to execute, walked the loan through the Credit Union, which was easy to do because West Lynn controlled the Credit Union, obtained the loan, and split it with the customer. Then, according to the allegation, West Lynn simply paid off the loan.
In November or December 1997, Mr. Altman told his partner, Mr. Speleotis, that he had spoken with Mr. Merberg. Mr. Speleotis recalls that Mr. Altman told him that Mr. Merberg was trying to blame West Lynn Creamery.
Mr. Altman directed a Rubin and Rudman lawyer, Kevin Geaney (“Mr. Geaney”), to conduct legal research. Rubin and Rudman’s billing records reflect that Mr. Geaney conducted the following legal research: 1.4 hours on November 18, 1997, on research regarding cases dealing with corporate and individual liability for tax evasion/conspiracy; 1.5 hours on November 19, 1997, on research regarding tax evasion/conspiracy regarding rebates; 2.3 hours on November 20, 1997, on research regarding tax evasion/conspiracy; and 1.7 hours on November 24, 1997, on research regarding “conspiracy/taxes as corporation or individual.”
Mr. Geaney also provided Mr. Altman with a folder entitled “Bribery-Commercial” containing copies of G.L.c. 271, Sec. 39, entitled “Illegal Gratuities, etc. and Penalty” and 18 U.S.C. Sec. 1952 entitled “Interstate and foreign travel or transportation in aid of racketeering enterprises.”
On November 20, 1997, a West Lynn Creamery employee named Paul Paulsen (“Paulsen”) testified before the federal grand jury. After the grand jury appearance, Mr. Altman prepared a memorandum to the file summarizing the areas covered by AUSA Hodgens in his questions to Paulsen before the grand jury. The memorandum states in part: “Hodgens asked about where the original checks were. Paulsen said that the original checks were still in existence, and Hodgens said that he wanted them.” Despite this request, the checks were not produced to AUSA Hodgens, and he never again asked for them.
On November 26, 1997, Mr. Altman again spoke with Mr. Merberg by telephone. Mr. Altman prepared another memorandum memorializing this conversation, which states in its entirety as follows.
I spoke with Jim Merberg on Wednesday, November 26,1977 [sic]. He said that he had had an additional conversation with his client. He said that his client was aware of other loans that West Lynn engineered with the Credit Union. He also said that the loan was not for the purpose for which it appeared to be made. He insisted that the Gavriels’ interest and West Lynn’s interest diverge and therefore he doubted that he could cooperate. Finally, he said that it was his view that the U.S. Attorney’s Office was also looking at West Lynn. I said it was my understanding that the Gavriels were a target and because the loan arrangement appeared to be so weird that the U.S. Attorney’s Office was taking a side trip to take a look at what that meant.
On December 5, 1997, Mr. Altman wrote another memorandum to the file summarizing a conversation with Attorney Milton Schwartz. The memorandum states:
On December 4, 1997, Greg Demakis telephoned me and told me to call Milton Schwartz. I did so. His telephone number is 227-0508. He said that he represented the Gavriels in the lawsuit that the Stratises brought against them. He said that on four separate occasions the Gavriels received $10,000 in loans from the Credit Uniona total of $40,000. He said that the Gavriels testified that they split the checks with the Stratises. The Stratises denied that and the jury believed the Stratises and not the Gavriels. Schwartz said that Stratis is a very sleazy guy. Apparently, he was having sex with his employees and stealing money from the till of the Dunkin Donuts. Schwartz said that he brought in a young woman who worked in one of the Dunkin Donuts shops who testified how Stratis came on to her and how he was taking money out of the till. Schwartz said that she was the only witness that was totally believable in the case and the Judge rejected it. During the course of my conversation with Schwartz, he continued to *602 refer to the payments received by the Gavriels from the Credit Union as kickbacks. I asked him why he called them kickbacks and he said “because that’s what they are.” I said, “Well, where are you getting that from?” He said, “Well, because those are kickbacks.” I said, “Well, West Lynn calls them rebates.” He said, “Well, I’m not much of a businessman; okay, they’re rebates.”
Schwartz is a nice guy who was pretty talkative. He may be the reason that Merberg, the Gavriels’ criminal attorney, has a skewed version of what went on here. Schwartz says that the Gavriels have been longtime friends of West Lynn, and have not pointed the finger at anyone at West Lynn. He said that the Gavriels never told him that West Lynn did anything wrong. Schwartz says that there were a lot of issues in the lawsuit between the Gavriels and Stratis. He said that he would send me all of the non-privileged documents pertaining to the checks and the loans and so forth. He said that he wouldn’t send stuff relating to other issues, such as the boat and the car and whether Stratis could force the Gavriels to give up their 50 percent ownership of the Dunkin Donuts shop to Stratis. Schwartz conceded that the Gavriels did not pay taxes on the monies received from the Credit Union. He mentioned Merberg’s name, and I didn’t want to press that point until I got his full story and the documents.
In December of 1997, Mr. Altman “was aware that there were issues outstanding that could go in any direction.”
After early December of 1997, Mr. Altman heard nothing further from AUSA Hodgens until September of 1998. Mr. Altman did no more work on this matter after December 12, 1997, until September of 1998.
There were negotiations in the late fall of 1997 and winter of 1998 between Scangas Bros. Holding, Inc. (“SBHI”) and Garelick Farms Inc. (“Garelick”) concerning the sale of the stock of SBHI to Garelick. SBHI was a holding company that held all of the capital stock of West Lynn Creamery. The negotiations, however, were terminated in a letter from Garelick’s president, Alan J. Bernon (“Bernon”), dated February 4, 1998. Bernon’s letter stated:
In light of that certain demand letter dated Januaiy 29, 1998 from Anthony M. Doniger, counsel to Katherine M. Diamond, to you, that we received yesterday from your counsel, Michael Altman, and the apparent ongoing disputes among the stockholders of SBHI, we believe that continuing discussions between SBHI and Garelick under the above referenced Memorandum of Intent regarding the proposed acquisition of SBHI by Garelick would no longer be productive. Therefore, we hereby request the termination of the Memorandum of Intent, which by its terms will expire on February 16, 1998. As we indicated before, Garelick is not prepared to move forward with the threat and uncertainly of stockholder litigation against SBHI and its directors and officers.
The history of the second-generation ownership of West Lynn Creamery through SBHI has been very litigious. It has been the nature of the dissident cousins who held minority interests in SBHI to oppose nearly every proposal made by Pappathanasi. Janice Scangas and Katherine Diamond have been the most combative.
Later, after the issues among the SBHI stockholders were resolved, negotiations for the purchase of SBHI resumed. Ultimately, on June 30, 1998, Suiza Foods Corporation (“Suiza”), through its wholly-owned subsidiary Garelick Farms, Inc., purchased all outstanding stock in SBHI, the parent company of West Lynn Creamery. Rubin and Rudman represented SBHI, West Lynn Creamery and the selling shareholders in connection with the sale. In the Stock Purchase Agreement, the West Lynn Creamery sellers made the following representations to Suiza.
Absence of Litigation. Except as set forth in Schedule 2.10oi the Company Disclosure Schedule, there is no claim, action, suit, litigation, proceeding, arbitration or investigation of any kind, at law or in equity (including actions or proceedings seeking injunctive relief), pending or, to the Company’s knowledge, threatened against the Company or any of its subsidiaries, and neither the Company or any of its subsidiaries is subject to any continuing order of, consent decree, settlement agreement or other similar written agreement with, or continuing investigation by, any Governmental Entity, or any judgment, order, writ, injunction, decree or award of any Governmental Entity or arbitrator, including, without limitation, cease-and-desist or other orders.
The Stock Purchase Agreement also required the West Lynn Creamery sellers to deliver an opinion of counsel to Garelick/Suiza. Thus, on June 30, 1998, Rubin and Rudman issued an Opinion Letter to Garelick. Paragraph 9 of the Opinion Letterthe particular paragraph of greatest significance to this casestated:
9. To our knowledge, except as set forth in Schedule 2.10 of the Company Disclosure Schedule, there is no claim, action, suit, litigation, proceeding, arbitration or, [sic] investigation of any kind, at law or in equity (including actions or proceedings seeking injunctive relief), pending or threatened against the Company or any of its subsidiaries and neither the Company nor any of its subsidiaries is subject to any continuing order of, consent decree, settlement agreement or other similar written agreement with, or continuing investigation by, any Governmental Entity, or any judgment, order, writ, injunction, decree or award of any Governmental Entity or arbitrator, including, without limitation, cease- and-desist or other orders.
*603 The Opinion Letter also stated that, for the purposes of the foregoing opinion, Rubin and Rudman “have relied upon the representations of factual matters contained in the Purchase Agreement and have made no independent investigation of such factual matters; however, nothing has come to our attention which causes us to doubt the accuracy thereof." The Opinion Letter stated that “[i]n rendering our opinions we have examined such materials as we have deemed relevant to those opinions . . .”
There also is a separate paragraph in the Opinion Letter that reads as follows.
With respect to matters stated to be “to our knowledge,” we call your attention to the fact that we have not made any independent review or investigation of agreements (other than those expressly referred to herein), instruments, orders, writs, judgments, rules, regulations or decrees by which our clients or any of their properties may be bound, nor have we made any investigations as to the existence of actions, suits, investigations or proceedings, if any, pending or threatened against our clients, except to the extent that any of the above is disclosed in any exhibit or schedule to the Purchase Agreement. However, nothing has come to our attention which causes us to doubt the accuracy of such exhibits or schedules.
The Opinion Letter closes with the following.
This opinion letter is rendered solely to you and for your benefit in connection with the transaction described herein and may not be relied upon in any manner or for any other purpose by, or circulated or delivered to, [sic] other person or entity, except your successors and assigns, without our prior written consent.
Mr. Barton was the corporate lawyer at Rubin and Rudman in charge of the stock transaction.
In early June 1998, during a brief discussion about the disclosures to be made in Schedule 2.10 to the Stock Purchase Agreement, Mr. Altman told Mr. Barton that West Lynn Creameiy had received a grand jury subpoena in October 1997. Mr. Barton told Mr. Altman that they should discuss the matter with the clients.
Later, at a meeting on June 16, 1998 (the “June 1998 meeting”), Mr. Barton, Mr. Altman, Mr. Speleotis and Pappathanasi, a selling shareholder, discussed whether the October 1997 grand jury subpoena was required to be included in Schedule 2.10. Another selling shareholder, Nicholas Scangas, also was present at the June 1998 meeting.
Also, at the June 1998 meeting, when discussing whether to include the matter on Schedule 2.10 as a prudent course to avoid future claims, Mr. Altman, in responding to a question from Mr. Barton, said that he had not heard from AUSA Hodgens for nearly six months and that it was his “guesstimate” that the Gavriel matter had probably gone away, with Gavriel paying a civil fine with heavy penalties for tax evasion. This “guesstimate" was consistent with Mr. Altman’s experience in representing clients in tax evasion cases.
At the June 1998 meeting, both Mr. Barton and Mr. Speleotis advised Pappathansi that it would be wise to include the grand jury subpoena/investigation in Schedule 2.10. However, Pappathanasi professed fear that such a disclosure would incite family members who frequently disagreed with him to interfere with the sale, and for that reason he did not want the matter included on Schedule 2.10. The closing of the transaction took place on June 30, 1998, with the Opinion Letter as part of the closing documents, and the grand jury subpoena/rebate investigation was not disclosed in Schedule 2.10.
In June 1998, Rubin and Rudman had a written policy concerning the issuance and preparation of opinion letters. The policy stated in part (with emphasis in the original):
3. Approval of Opinions. Our Firm’s policy is that certain partners must approve opinion letters covered by this policy.
The person who proposes to issue the opinion letter must bring the draft opinion to a partner authorized to approve opinion letters in the particular area, with the completed back-up file or binder. It is the responsibility of the reviewing partner (the “countersigning partner”) to review the opinion letter, satisfy himself or herself as to its propriety and also the existence and completeness of the contents of the opinion file or binder. If there is no such backup, the opinion cannot be approved or issued.
If the countersigning partner reviews the opinion and back-up and finds it in order, he or she should approve it. This may be signified by both signing the opinion letter itself or, if two signatures on a letter seems odd or out of place, the countersigning partner may merely sign the copy of the opinion in our back-up file. Only partners may sign opinion letters. Obviously, if the countersigning partner does not agree with the substance of the opinion, the Practice Area Leader, the Managing Partner, the Assistant Managing Partner or the Firm Chairman ought to be consulted immediately to resolve the disagreement.
The countersigning partner should keep a copy of the opinion he has approved for his or her own file.
As of June 30, 1998, Jason A. Sokolov (“Mr. Sokolov”), a partner at Rubin and Rudman, was asked by Mr. Barton to countersign the Opinion Letter. In actuality, however, the Opinion Letter was not signed by any individual lawyer. Rather, it was signed:
Very truly yours,
/s/ Rubin and Rudman, LLP
Rubin and Rudman, LLP
*604 Mr. Sokolov, at that time, was the countersigning partner for Rubin and Rudman opinion letters. Ordinarily, before he would countersign a Rubin and Rudman opinion letter, he would generally inquire of the person who handled litigation for the client/company as to whether there was anything else they had to discuss relative to the opinion. He did not do so in this matter.
Mr. Sokolov had participated extensively in drafting the Opinion Letter. Among other things, Mr. Sokolov was responsible for adding the nothing-has-come-to-our-attention-which-causes-us-to-doubt-the-accur acy-thereof language in the two places that it appears in the Opinion Letter.
When Mr. Sokolov reviewed and approved the Opinion Letter, he was totally unaware of any grand jury investigation. He had not been told about it by Mr. Atman, Mr. Barton or Mr. Speleotis. Nor was he told about Mr. Atman’s conversations with Mr. Merberg, nor did he see any of Mr. Atman’s memoranda.
Mr. Sokolov said he “would have sat down with [Mr. Atman] and . . . would have reviewed the entire situation from the beginning and discussed what the potential was for a real issue developing” if he had been told about Mr. Atman’s conversations with Mr. Merberg.
At trial, Mr. Atman testified that he was not familiar with corporate transactions like that involved in the sale of West Lynn Creamery. He further claimed that at the June Í998 meeting, he was unaware that the information asked of him about the 1997 grand jury subpoena and matters related to it was going to be considered in connection with a Rubin and Rudman opinion letter. He apparently thought that he was only being asked about matters to be included in Schedule 2.10 that was to be a part of the Stock Purchase Agreement. Indeed, he said that he never knew about or even saw the Opinion Letter in issue until the time that this lawsuit was filed.
At the June 1998 meeting, what Mr. Atman reported was accurate, as far as it went. However, his report did not include the following facts: there was another grand jury subpoena to the Communiiy Credit Union of Lynn, which was the credit union that made the loans to the Gavriels and others, that sought, among other things, bank records of Pappathanasi, and Paul Spiliotis and Robert G. Walsh, two other West Lynn Creameiy employees; AUSA Hodgens had told him in the fall of 1997 that it was too early to say whether West Lynn Creameiy was a target or a subject of the investigation; AUSA Hodgens had suggested that West Lynn Creameiy enter into a proffer practice that would enable West Lynn Creameiy to provide information about its rebate program and not be charged as a result of what was revealed; the Gavriels’ attorney, Mr. Merberg, had indicated that Michael Gavriel was going to cooperate with the AUSA and implicate West Lynn Creameiy in the matter; while some of the rebate payments were made in cash, most others were made by checks that did not reveal that West Lynn Creameiy was the payor; or the results of any of the legal research on criminal issues performed by Mr. Geaney.
On September 10, 1998, Mr. Atman received a letter from AUSA Hodgens (Exhibit 58), advising him that a Criminal Information was filed that day charging Michael Gavriel “in a conspiracy to defraud the Internal Revenue Service, in violation of Title 18, United States Code, Section 371.”
The Criminal Information, which was enclosed, made reference to a certain “Vendor X.” AUSA Hodgens’s letter to Mr. Atman “advised that the unnamed Vendor ‘X’ in the Information is West Lynn Creamery.” He further “advised that West Lynn Creameiy is a target of a Federal grand juiy investigation.” (Emphasis in original.)
The Criminal Information describes the manner and means by which the conspiracy charged was carried out. It included “cash infusions to operate” the Gavriels’ donut shops with Vendor X “act[ing[ as a conduit for obtaining loans through a North Shore credit union,” and included arrangements to have Vendor X “repay the credit union loans by generating a stream of income through an invoicing and commercial kickback scheme set up by Vendor X, which is commonly referred to as a ‘Rebate Program.’ ”
The Criminal Information further recited that Gavriel “ordered certain quantities of products from Vendor X, which, in turn, generated materially false and inflated sales invoices and caused those invoices to be sent to” Gavriel through the U.S. mails.
Bernon, president of Garelick, made clear that he would not have done the deal to buy West Lynn Creameiy if he had known about the Gavriel grand juiy subpoena/rebate investigation. Before the closing, he had examined Schedule 2.10 and was satisfied with the lack of impact of any of the matters included thereon on Garelick’s purchase of West Lynn Creameiy.
On March 26, 2001, West Lynn Creameiy entered into an agreement to plead guilty to a Criminal Information charging it with a conspiracy to defraud the United States by impeding, impairing, obstructing and defeating the lawful government functions of the Internal Revenue Service, in violation of 18 U.S.C. Sec. 371. This was the same charge as brought against Michael Gavriel in September 1998. The plea agreement came after extensive negotiations with the U.S. Department of Justice, acting through the U.S. Attorney’s Office in Boston. It resulted in West Lynn Creameiy paying a fine of $7,200,000 and a special assessment of $400.
The amount of the fine came about as a result of the application of the U.S. Sentencing Guidelines to the crime charged. The Guideline Fine Range pro *605 duced a minimum fine of $7,200,000 and a maximum fine of $ 14,400,000. Consequently, West Lynn Creamery was assessed the minimum fine permitted under the Guidelines. The agreement was approved by Judge Saris on June 5, 2001.
In addition to the fine and special assessment, West Lynn Creamery received from the U.S. Attorney’s Office a commitment to write a letter on West Lynn Creamery’s behalf that would state that these actions took place under prior ownership and that the current ownership had cooperated fully, and that the government did not have any issues or concerns with existing management. This letter then could be taken to the U.S. Department of Agriculture and help insure that the WLC did not get debarred and would be able to keep its government business. At that time the WLC group was doing about $330,000,000 annually in government business.
The plaintiffs presented expert testimony from Attorney Jeffrey E. Stone (“Mr. Stone”), an experienced “white-collar” criminal defense attorney and a former federal prosecutor, to the effect that the plea agreement and the amount of the fine were reasonable under the circumstances. The grounds for that opinion took into consideration the strength of the government’s case; the weakness of the defense; the good result in the bargain over the amount of the fine; and the favorable collateral issues, particularly the avoidance and assistance on the potential for debarment on government business. The Court finds Mr. Stone’s opinions to be credible.
Attorneys fees in the amount of $2,021,400.75 and costs of $149,953.86, aggregating $2,171,354.50, are said to have been incurred by the WLC group in responding to and resolving the criminal charges against West Lynn Creameiy. This information was presented at the trial in summary form and marked as Exhibit 93.[5]
RULINGS OF LAW
The plaintiffs’ three claims against the defendants are:[6] negligent misrepresentation, common-law negligence, and violations of G.L.c. 93A. The claims for negligent misrepresentation and for common-law negligence, in the context of this case, are essentially overlapping. Thus, the Court will focus primarily on the negligent misrepresentation claim.
“In order to recover for negligent misrepresentation!,] a plaintiff must prove that the defendant (1) in the course of his business, (2) supplie[d] false information for the guidance of others (3) in their business transactions, (4) causing and resulting in pecuniary loss to those others (5) by their justifiable reliance upon the information, and (6) with failure to exercise reasonable care or competence in obtaining or communicating the information.” Nota Constr. Corp. v. Keyes Assocs., Inc., 45 Mass.App.Ct. 15, 19-20(1998). Golber v. Bay Bank Valley Trust Co., 46 Mass.App.Ct. 256, 257 (1999).
Savers Property & Casualty Insurance Company v. Admiral Insurance Agency, Inc., 61 Mass.App.Ct. 158, 169 (2004).
Because this is a business transaction, it is Section 11 of G.L.c. 93A that applies. That section creates a cause of action for
[a]ny person who engages in the conduct of any trade or commerce and who suffers any loss of money or properly, real or personal, as a result of the use or employment by another person who engages in any trade or commerce of an unfair method of competition or an unfair or deceptive act or practice . . .
This is the general framework in which the Court must assay the acts of the parties to this litigation.
The specific context in which this case must be examined is the rendering of an opinion or report by a law firm to an entity that is not its client. The particular kind of opinion involved here is often referred to as a “no litigation” opinion.
In this situation, the Restatement (Third) of the Law Governing Lawyers (“Restatement”) provides guidance. “In furtherance of the objectives of a client in representation, a lawyer may provide to a nonclient the results of the lawyer’s investigation and analysis of facts or the lawyer’s professional evaluation or opinion on the matter.” Restatement, Sec. 95(1). “In providing the information, evaluation, or opinion under Subsection (1), the lawyer must exercise care with respect to the nonclient . . . and not make any false statements prohibited under sec. 98.” Restate-. ment, Sec. 95(3).
To prevail, the plaintiffs here must demonstrate that the Rubin and Rudman defendants failed to conform to customary practice. “Custom and practice determining the scope of diligence in represented situations is articulated in bar-association reports, treatises, and articles,” Restatement, Sec. 95, Comment a. This leads the Court to an extensive report of several bar association experts on the customs and practices surrounding the rendering of “no litigation” and other 1ypes of opinions by lawyers to third parties in the context of a sale or other transfer of a business client. The report is entitled “Third-Party ‘Closing Opinions’ * * * A Report of the TriBar Opinion Committee,”[7] (referred to hereafter as the ‘TriBar Report”). The TriBar Report may be found at 53 Bus. Law 591-679 (1998). All parties in this case agree that the TriBar Report is the appropriate reference for the situation at issue. Indeed, experts presented on each side in this trial were leading participants and contributors to the TriBar Report.
The opinion recipient has a right to rely upon the opinion. This “means that a professional duty is owed by the third-party opinion giver to the opinion recipi *606 ent. As a result... if the opinion is negligently given and results in damage to the opinion recipient, the opinion recipient has a claim against the opinion giver.” TriBar Report, p. 604, n.29. See, e.g., Nycal Corp. v. KPMG Peat Marwick, LLP, 426 Mass. 491, 493-99 (1998).
Sec. 552 of the Restatement (Second) of Torts describes the tort of negligent misrepresentation committed in the process of supplying information for the guidance of others as follows:
One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
That liability is limited to
loss suffered (a) by a person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
The SJC in Nycal, supra, 426 Mass, at 497, particularly adopted Comment h to Sec. 552 of the Restatement, which reads as follows:
[I]t is not required that the person who is to become the plaintiff be identified or known to the defendant as an individual when the information is supplied. It is enough that the maker of the representation intends it to reach and influence either a particular person or persons, known to him, or a group or class of persons, distinct from the much larger class who might reasonably be expected sooner or later to have access to the information and foreseeability to take some action in reliance upon it ... It is sufficient, in other words, insofar as the plaintiff s identity is concerned, that the maker supplies the information for repetition to a certain group or class of persons and that the plaintiff proves to be one of them, even though the maker never had heard of him by name when the information was given. It is not enough that the maker merely knows of the ever present possibility of repetition to anyone, and the possibility of action in reliance upon it, on the part of anyone to whom it may be repeated.
“An opinion is not a guaranty of an outcome, but rather an expression of professional judgment. That professional judgment is necessarily limited by a variety of factors discussed in [the TriBar] Report.” TriBar report, p. 596.
“Factual information that is the subject of an opinion (e.g., no litigation)... must be established in away that meets the needs of the parties to the transaction.” TriBar Report, p. 598. In actuality, what Rubin and Rudman provided was not so much an opinion as it was a confirmation of facts relating to its knowledge of what litigation and investigations may have been pending or threatened against its client, West Lynn Creameiy.[8]
“Opinion givers must of necessity use their own judgment as to their conformity with customary practice in the circumstances they face.” TriBar Report, p. 600. Both “the Restatement (Second) of Torts and the Restatement (Third) of the Law Governing Lawyers indicate that the customary practices of lawyers similarly situated is a key factor in determining liability.” Id.
It is equally important that the opinion giver (Rubin and Rudman here) avoid misleading the opinion recipient (the plaintiffs here). “When considering if an opinion to be given will mislead the opinion recipient, opinion preparers must think not only about the opinion itself but also about areas excluded from the opinion.” TriBar Report, p. 602.
“Inclusion of the phrase ‘to our knowledge’ in an opinion does not by itself. . . state a limitation on the investigation required by customary diligence.” TriBar Report, p. 619.
An opinion letter is usually written on a law firm’s letterhead and signed in the name of the firm. It thus purports to express the opinion of the firm, not merely that of the opinion preparers. The fact that an opinion letter is signed in the name of a law firm has given rise to confusion over the obligations of a law firm in preparing an opinion letter. A law firm practices only through the lawyers who work on its behalf. The opinion preparers determine the content of the opinion letter and are responsible to perform the work required to support the opinions being expressed. The law firm fulfills its obligations to the opinion recipient through the performance by the opinion preparers of customary diligence in preparing and delivering the opinion letter.
TriBar Report, p. 605.
Opinion preparers . . . may have occasion to make . . . inquiries directed to specific issues raised by the opinion, particularly when they are aware that a lawyer in the firm who is not involved in the preparation of the opinion has information obtained through representation of the client in other matters that is likely to have a material bearing on the opinion issue. The timing and content of these inquiries will vary; they will usually be informal. The opinion preparers must take into account the responses to these inquiries in determining the reliability of the information being used to support the opinion.
TriBar Report, p. 614.
*607 The no litigation opinion is intended to elicit information regarding the existence of pending and threatened actions and proceedings . . . that might be of concern to the opinion recipient . . . The presence or absence of the phrase “to our knowledge” does not change the meaning of the opinion. With or without “to our knowledge,” the opinion does nothing more than provide comfort to the opinion recipient that the opinion preparers do not know the list of litigation referred to in the opinion letter to be incomplete or unreliable.
TriBar Report, p. 664.
The Rubin and Rudman defendants presented as one of their expert witnesses Boston attorney Donald Glazer (“Mr. Glazer”). Mr. Glazer is highly qualified to speak on the subject of opinion writing. He is, among other things, one of two Co-Reporters of the TriBar Report. The other Co-Reporter was one of WLC’s experts, New York attorney Arthur Field (“Mr. Field”).
When discussing the no litigation opinion, Mr. Glazer agreed with the following statement; in fact it is included in a book that he wrote on the subject.
The no-litigation opinion is based on the assumption that the opinion giver has a special awareness of pending or threatened actions, a special ability to verify their existence or nonexistence through client records, or special ability to ask the right questions of the appropriate people to determine that the certificate provided by the officers of the company includes and appropriately describes all pending actions.
Transcript, Vol. 7, p. 62,11. 12-21.
The Court next considers in more detail the teachings of Nycal That case involved the duties of accountants to third parties for audit reports of financial statements of their clients. The situation, however, is similar in many respects to when lawyers render opinions or confirmations about facts relating to their clients to third parties. “[T]here is no reason to arbitrarily limit the potentially liable defendants to that class [accountants] of professionals.” Prudential Ins. Co. of America v. Dewey, Ballantine, Bushby, Palmer & Wood, 80 N.Y.2d 377, 381, 590 N.Y.S.2d 831, 833 (1992).
In Nycal, the Supreme Judicial Court addressed, for the first time, “the scope of liability of an accountant to persons with whom the accountant is not in privily." 426 Mass, at 493. In doing so, it adopted the test taken from Sec. 552 of the Restatement (Second) of Torts. Id. at 497-98.
Also, in Nycal the SJC concurred with the California Supreme Court’s holding in Bily v. Arthur Young & Co., 3 Cal.4th 370, 394, 834 P.2d 745, 769 (1992), that Sec. 552 appropriately recognizes the commercial realities in play. Nycal, supra, 426 Mass, at 497. In Bily, the California court spoke of both negligent misrepresentations and intentional fraud in the preparation and dissemination of an audit report. Bily, supra, 834 P.2d at 747.
As noted above, the purpose of the “no litigation” opinion is to do nothing more than provide comfort to the opinion recipient, the plaintiffs here, that the opinion preparers, Mr. Barton, with some help from Messrs. Altman, Speleotis and Sokolov, all acting for Rubin and Rudman, did not know the list of pending or threatened litigation and investigations “set forth in Section 2.10 of the Company Disclosure Schedule” to be incomplete or unreliable. Further, that comfort was reinforced by Rubin and Rudman’s statement that “nothing has come to [its] attention which causes [it] to doubt the -accuracy thereof.”
Thus, an initial question here is whether what Rubin and Rudman knew about the Gavriels’ grand jury subpoena and the rebate investigation as of June 30, 1998, constituted an investigation threatened against West Lynn Creamery or constituted a “continuing investigation by [ ] any Governmental Entity.”
A further question is whether Rubin and Rudman misled the plaintiffs by rendering its opinion without disclosing the Gavriel grand jury subpoena and the rebate investigation. In other words, given Rubin and Rudman’s collective knowledge, could it so unequivocally avoid reference to the grand jury subpoena/rebate investigation?
The Court will assess the first question at two times. First the Court will examine what Rubin and Rudman, mostly through Mr. Altman, knew in December 1997. Then the Court will consider whether the passage of five or six months in the run-up to the June 30, 1998, closing without any communication from AUSA Hodgens made any difference. In this process, the Court is not looking to see if Rubin and Rudman correctly predicted the future, but rather whether what it knew, in and of itself, should have been disclosed.
The Court begins by observing what occurred on September 10, 1998, over two months after the June 30, 1998, closing. It was then that the Criminal Information filed against Michael Gavriel, and the included charges therein relating to him and to “Vendor X,” known to be West Lynn Creamery, became known to Mr. Altman. Of course, neither Mr. Altman nor anyone else at Rubin and Rudman knew of this Criminal Information at any time prior to September 10, 1998. Thus, in and of itself, the Criminal Information was not a reportable piece of information in the June 30, 1998, Opinion Letter. At the same time, however, the charges laid out in the Criminal Information are precisely what Mr. Altman became aware of in his representation of West Lynn Creamery when responding to the grand jury subpoena in 1997. Those charges are set forth in the “Manner and Means” section of the *608 Criminal Information, (Exhibit 58), and include the following.
6. GAVRIEL periodically needed cash infusions to operate his donut shops and learned that Vendor X would act as a conduit for obtaining loans through a North Shore credit union (“Credit Union A”), whose identity is known to the United States Attorney.
7. GAVRIEL arranged with Vendor X to repay the Credit Union A loans by generating a stream of income through an invoicing and commercial kickback scheme set up by Vendor X, which was commonly referred to as a “Rebate Program.”
8. As part of the scheme, GAVRIEL ordered certain quantities of products from Vendor X, which, in turn, generated materially false and inflated sales invoices and caused those invoices to be sent to GAVRIEL through the United States Mails.
9. GAVRIEL, in turn, caused the various entities that he controlled to issue checks made payable to Vendor X in satisfaction of the materially false and inflated invoices.
10. Thereafter, as part of the scheme, Vendor X remitted and caused to be remitted to Gavriel and/or to Credit Union A, on behalf of Gavriel and/or the foregoing entities controlled by Gavriel, certain monies and funds through “rebate” checks, which represented the difference between the actual prices of products, as reflected on the materially false invoices, in the approximate amounts, as follows: [here was an aggregated listing showing a grand total of $431,401).
11. GAVRIEL and Vendor X caused these remitted monies and funds to be applied to the GAVRIEL Credit Union A loans. At various times, after the loans were paid off, GAVRIEL and Vendor X caused the remitted monies and funds to be made payable to the foregoing entities controlled by GAVRIEL.
12. GAVRIEL caused the remitted monies and funds to be diverted from the foregoing entities that he controlled to himself and others, whose identities are known to the United States Attorney.
13. For the years 1992 through 1996, GAVRIEL caused the foregoing entities that he controlled to file materially false U.S. Corporation Income Tax returns (Forms 1120S) in that approximately $431,401 of the remitted monies and funds was not reported as receipts of the businesses.
Expert testimony from Mr. Stone, an attorney with substantial experience in handling white-collar criminal defense work, whose testimony this Court credits, concludes that Mr. Altman should clearly have been alerted that West Lynn Creamery was in serious trouble with the rebate investigation. Further, Mr. Stone opined that it was not within the standard of care for a white-collar criminal defense lawyer to conclude as early as June of 1998 that the investigation had gone away.
On the latter point about whether the investigation had gone away, the defendants’ expert, Mr. Glazer, was asked to assume that Mr. Altman said to Mr. Barton that it was his “guesstimate” that the investigation had gone away. Mr. Glazer responded:
I think if Altman sa[id] it was his guesstimate, it’s a much tougher issue, and I think Barton said as much.
In Barton’s testimony he indicated, too, that he thought that would have been a much tougher issue, which led me to conclude that is not what he heard Mr. Altman say.
Transcript, Vol. 7, pp. 83-83,11. 23-24, 1-5.
But on this point, Mr. Glazer was mistaken in his conclusion about what Mr. Altman said to Mr. Barton. Mr. Altman twice told this Court that he told Mr. Barton that his best “guesstimate” was that the entire investigation had gone away. Transcript, Vol. 2, p. 143,11. 11-12, and Vol. 3, p. 139,11. 2-8.
This Court concludes and rules that the information that Mr. Altman provided to Mr. Barton at the June 16, 1998, meeting regarding the status of the Gavriel grand juiy subpoena and the rebate investigation as it related to West Lynn Creamery, had Altman known that the information was for the purpose of an opinion stating that Rubin and Rudman knew of no threatened governmental investigation of West Lynn Creamery, would have fallen below the standard of a reasonably competent white-collar criminal defense lawyer.
It does not excuse the situation for Mr. Altman to say he did not understand corporate transactions or for Mr. Barton to say he relied solely on Mr. Altman’s expertise regarding the handling of the grand jury subpoena and its significance for purposes of the opinion being rendered. A see-no-evil, hear-no-evil, speak-no-evil approach cannot be what the TriBar Report is teaching the opinion-writing bar.[9] Both sides’ experts were in agreement on this point.
The plaintiffs’ expert, Mr. Field, said:
Now, it would make no sense to me if we are going to run a fair system, and that’s what we intend to do, to ignore these facts. Now, if somebody . . . coming in off the street were to say: “Oh, somebody is going to sue you,” you have no reason to believe them, perhaps that’s different. But we need to look at the nature of the facts, the credibility of what comes before you.
There is no license here to avert your eyes, to ignore the realities.
Transcript, Vol. 5, pp. 65-66,11. 21-24 and 1-6.
The Rubin and Rudman defendants’ expert, Mr. Glazer, said essentially the same.
*609 I said a lawyer can’t simply close his or her eyes and cover his or her ears and ignore things that are right there that they know about.
They can’t do that. They have to make a responsiblethey have to make a good-faith judgment as to that. They can’t beta the securities law, we have the context of scienter. It can’t be reckless. That’s another way . . .
Transcript Vol. 7, p. 112, 11. 7-16.
Mr. Altman, however, was not the opinion preparer. Indeed, he testified that he did not even know that what he was being asked about at the June 16, 1998, meeting was to be considered for inclusion in a Rubin and Rudman opinion letter. He claims not to have known about the opinion letter until the commencement of this lawsuit. This surprised the Court, but it accepts the testimony as given. This testimony suggests not so much a failure on Mr. Altman’s part, but rather a significant breakdown in the careful process established at Rubin and Rudman regarding opinion letters. Mr. Barton did not carry his investigation far enough; and Mr. Sokolov seems to have overlooked the firm’s policy on opinion letters.
There is a dramatic difference in asking a lawyer in Mr. Altman’s position whether he thinks a grand jury investigation has gone away, and asking him whether his law firm can decline to reveal the grand jury investigation in an opinion letter that confirms the absence of pending or threatened investigations, while being embroidered with the nothing-has-come-to-our-attention-which-causes-us-to-doubt-the-accuracy-t hereof language.
It cannot be consistent with the customary practice relating to opinion letters, so elaborately expressed in the TriBar Report, to permit the opinion preparer to avoid his obligations to the opinion recipient by the simple artifice of blindly adopting the report of a fellow attorney’s handling of a criminal grand jury subpoena for the client in question when that fellow attorney does not even know that he is providing grist for an opinion letter mill.[10]
Gavriel’s March 25, 1998, plea agreement makes clear that there did exist an ongoing investigation. See footnote 10 below. Rubin and Rudman, however, professed not to know about it. In its Opinion Letter, however, Rubin and Rudman not only failed to list in Schedule 2.10 the Gavriel grand jury subpoena/rebate investigation, it went a significant step further when it affirmatively said: “nothing has come to our attention which causes us to doubt the accuracy thereof.” These words"nothing has come to our attention which causes us to doubt the accuracy thereof'appear in the Opinion Letter not just once, but twice.
The Court repeats the words of the TriBar Report, p. 602, stated above. “When considering if an opinion to be given will mislead the opinion recipient, opinion preparers must think not only about the opinion itself but also about areas excluded from the opinion.” (Emphasis added.)
The Court agrees with Mr. Field when he said:
Mr. Barton should have either decided that he could not give the opinion because he had some bad facts and chose not to dispel them or he should have disclosed these facts to the purchaser. Opinion Letters, after all, are communication; and the question is: Are you communicating the facts as they have been requested in a fair and objective way?
Transcript, Vol. 5, pp. 67-68, 11. 20-24 and 1-3.
Another relatively recent case, albeit dealing with a different kind of attorney’s opinion, sheds some light on the situation presented here. In Williams v. Ely, 423 Mass. 467 (1996), Justice Wilkins made the following comments at p. 476.
It does not matter that the opinion that the disclaimers would generate no adverse gift tax consequences was a reasonable view of the law in 1975. The problem is not that Gaston Snow gave reasonable advice that in time proved to be wrong. The problem is that the apparent certainty of the opinion given, at a time when the issue was not conclusively resolved, denied the plaintiffs the opportunity to assess the risk and to elect to follow alternative estate planning options. If, as the judge found, attorneys in the estate planning and tax field would have advised clients of the risk, the failure of Gaston Snow to advise the plaintiffs of the risk was negligent.
Here, even more so than in Williams, the problem is that the apparent certainly of the confirmation given by Rubin and Rudmanthat there was no threatened investigation involving West Lynn Creameiycame in an affirmative statement; it was not an oversight. And the confirmation was made at a time when it was not correct, thereby denying the plaintiffs the opportunity to assess the risk and to elect to follow alternative options with regard to the purchase of West Lynn Creamery.
In making the foregoing ruling, the Court has applied an objective standard to the actions of Rubin and Rudman. It is not basing its conclusions on, or finding liability because of, mere errors of judgment.
The Rubin and Rudman defendants did not conduct the inquiry that they were required to make by customary practice. The confirmation they gave, grounded as it was as on errors of fact, created for the recipients the comfort that an ongoing investigation did not exist and that nothing had come to the attention of Rubin and Rudman that cast doubt about the accuracy of that report.
The Court turns now to the subjects of whether the plaintiffs were (a) persons or one of a limited group of persons for whose benefit and guidance Rubin and Rudman intended to supply the information; and (b) *610 through reliance upon it in a transaction, that Rubin and Rudman intended the information to influence the recipients. Restatement (Second) of Torts, Sec. 552.
The plaintiffs were definitely “one of a limited group of persons for whose benefit and guidance Rubin and Rudman intended to supply . . . information.”
What remains is whether Rubin and Rudman intended the plaintiffs to rely upon the Opinion Letter in the West Lynn Creamery acquisition and whether Rubin and Rudman intended the information therein to influence the plaintiffs in the matter. Two things confirm this: (1) Rubin and Rudman’s own words; and (2) the June 30, 1998, closing.
The last sentence of the Rubin and Rudman Opinion Letter contains Rubin and Rudman’s intent: “This opinion letter is tendered solely to you and for your benefit in connection with the transaction described herein and may not be relied upon in any manner or for any other purpose by, or circulated or delivered to, [sic] other person or entity, except your successors and assigns, without our prior written consent.”
Further, the Opinion Letter was a condition of the closing; it was present at the closing; and the closing was accomplished.[11] See Prudential Ins. Co., supra, 80 N.Y.2d at 384-85, 590 N.Y.S.2d at 834-35.
[I]n Yorke v. Taylor, 332 Mass. 368, 374 (1955), [the Supreme Judicial Court] adopted the rule of the Restatement of Torts sec. 540 (1938), which states: “The recipient in a business transaction of a fraudulent misrepresentation of fact is justified in relying on its truth, although he might have ascertained the falsity of the representation had he made an investigation.” The Restatement (Second) of Torts sec. 540 states: “The recipient of a fraudulent misrepresentation of fact is justified in relying upon its truth, although he might have ascertained the falsity of the representation had he made an investigation.” Restatement (Second) of Torts sec. 541 states: “The recipient of a fraudulent misrepresentation is not justified in relying upon its truth if he knows that it is false or its falsity is obvious to him.” There is thus a distinction between a falsity that could only be uncovered by way of “investigation” and a falsity that was readily apparent or “obvious.” Comment as to Restatement (Second) of Torts sec. 540, supra, states that, “if a mere cursory glance would have disclosed the falsity of the representation, its falsity is regarded as obvious under the rule stated in sec. 541.”
Kuwaiti Danish Computer Co. v. Digital Equipment Corporation, 438 Mass. 459, 467-68 (2003).
In the matter before the Court, the Rubin and Rudman defendants assert that they had no knowledge of the continuing nature of any investigation resulting from the Gavriel grand jury subpoena or that West Lynn Creamery might be involved as a target or subj ect thereof. Accepting that as true,[12] the Court notes that the same defendants cannot successfully argue that any falsity in their Opinion Letter was readily apparent or obvious. The plaintiffs were justified in relying on the Opinion Letter and the recitation contained in Schedule 2.10 made a part thereof.
The Court finds the amount of the fine and special assessment$7,200,400to be an appropriate amount for assessment as an element of damages as a direct consequence of the Opinion Letter’s misleading failure to warn of the grand jury subpoena/rebate investigation. The amount of the fine came, after all, from the mandatory application of the U.S. Sentencing Guidelines, not from some vague opinion of an economic expert. Further, the amount of the fine was at the low end of the Guideline Fine Range.
The Court also agrees that those reasonable attorneys fees and expenses that were incurred after the June 30, 1998, closing and were responsive to the matter as it became known on September 10, 1998, are the only other element of damages. As noted above, the amount and reasonableness of those fees and expenses remains for further proceedings.
The defendants argue that there was a failure on the part of the plaintiffs to mitigate their damages. In pressing this argument, they point to the provision of the Stock Purchase Agreement that makes their former clients, Pappathanasi and the two Scangas brothers, indemnitors with regard to any representations and warranties contained in the agreement, particularly Schedule 2.10. No claim for indemnification was made by the WLC group within the time limits provided in the Stock Purchase Agreement and the plaintiffs, before that time expired, had more than enough knowledge to proceed with an indemnification claim.
The plaintiffs did not just ignore Pappathanasi and the Scangas brothers, however. They were named as defendants in this law suit. Nine of the eleven counts in the Second Amended Complaint are directed at Pappathanasi and the Scangas brothers. These counts are as follows: Count I and Count III for fraud/misrepresentations; Count IV for civil conspiracy; Count V for unjust enrichment; Count VI for negligent misrepresentation; Count VII for violation of G.L.c. 93A; Count IX for reimbursement of indemnification advances; Count X for rescission; and Count XI for breach of contract.
On July 20, 2004, all parties to this action entered into a stipulation, pursuant to Mass.R.Civ.P. Rule 41 (a) (ii), dismissing, with prejudice, all of the plaintiffs’ claims against Arthur Pappathanasi, Nicholas Scangas and Christopher Scangas, and the dismissal, with prejudice, of all of the Scangas defendants’ counterclaims against the plaintiffs. See Paper #108. The stipulation of dismissal was signed by counsel for all *611 parties, including counsel for the Rubin and Rudman defendants.
The stipulation of dismissal does not describe in any way what was involved in the resolution of these claims, e.g., whether anything of value was paid or delivered by the Scangases or Pappathanasi to any of the WLC entities. The signatories to the stipulation are presumed to know what was involved and the significance of what was being signed, and they are fully bound by the stipulation.
The defendants here presented no evidence at the trial of this case suggesting in any way that anything about the resolution of the claims with Pappathanasi and the Scangases needs to be considered with regard to the proper measure of damages due against the Rubin and Rudman defendants; and it will not be. See, e.g., Wadsworth v. Boston Gas Co., 352 Mass. 86, 94 (1967); Anti v. Boston Elevated Ry. Co., 247 Mass. 1, 6 (1923). The Court rules that there was no failure to mitigate damages by the plaintiffs.
Next, the Court focuses specifically on the count seeking relief against the Rubin and Rudman defendants for alleged violation of G.L.c. 93A, Sec. 11.
There is no question but that the conduct in issue here occurred primarily and substantially in Massachusetts. The “center of gravity of the circumstances that give rise to the claim” is clearly in the Commonwealth. Kuwaiti Danish Computer Co., supra, 438 Mass, at 473. Nor is there any doubt that the plaintiffs suffered a loss of money resulting from the actions of the Rubin and Rudman defendants. See, e.g., Baldassari v. Pub. Fin. Trust, 369 Mass. 33, 45 (1975).
There is, however, at least some question as to whether the actions by the Rubin and Rudman defendants met the “trade or commerce” requirement of c. 93A. See, e.g., First Enters., Ltd. v. Cooper, 425 Mass. 344, 347 (1997). Were this a legal malpractice case the answer seems clear. See Brown v. Gerstein, 17 Mass.App.Ct 558, 569-71 (1984). The WLC group, however, were not Rubin and Rudman’s clients and Rubin and Rudman’s obligations or duties to the WLC group arise only from those factors that are required by custom and practice in issuing opinion letters to nonclients.
The “trade or commerce” issue notwithstanding, a further and more significant issue on the c. 93A claim is whether the plaintiffs have met the greater burden that the appellate courts have instructed must apply to claimslike that herefiled under sec. 11. See, e.g., Madan v. Royal Indemn. Co., 26 Mass.App.Ct. 756, 763 n.7 (1989). “One can easily imagine cases where an act might be unfair if practiced upon a commercial innocent yet would be common practice between two people engaged in business.” Spence v. Boston Edison Co., 390 Mass. 604, 616 (1983).
It has been said that in determining whether the conduct of the Rubin and Rudman defendants was unfair, this Court “should . . . focus on the nature of the challenged conduct and on the purpose and effect of that conduct." Stagecoach Transp., Inc. v. Shuttle, Inc., 50 Mass.App.Ct. 812, 817 (2001). See also Mass. Employers Ins. Exch. v. Propac-Mass, Inc., 420 Mass. 39, 42-43 (1995). More recently, however, the SJC appears to have reverted back to a more objective standard:
We have stated that “a practice or act will be unfair under G.L.c. 93A, sec. 2, if it is (1) within the penumbra of a common law, statutory, or other established concept of unfairness; (2) immoral, unethical, oppressive, or unscrupulous; or (3) causes substantial injury to competitors or other business people.” Heller Fin. v. Insurance Co. of N. Am., 410 Mass. 400, 408 (1991) ... We have stated that “(t]he purpose of G.L.c. 93A is to improve the commercial relationship between consumers and business persons and to encourage more equitable behavior in the marketplace.” Poznik v. Massachusetts Med. Professional Ins. Ass’n, 471 Mass. 48, 53 (1994).
Morrison v. Toys “R” Us, Inc., Massachusetts, 441 Mass. 451, 457-58 (2004).
Here, the Court rules that the actions of the Rubin and Rudman defendants clearly were not “immoral, unethical, oppressive, or unscrupulous.” PMP Assocs. v. Globe Newspaper Co., 366 Mass. 593, 596 (1975). Further, the connection between Rubin and Rudman and the plaintiffs is not clearly a “commercial relationship between consumers and business persons,” nor did the situation occur in “the marketplace.”
Also, the plaintiffs are hardly lacking in sophistication about the matter in issue. The WLC parties, on a regular basis, made acquisitions countrywide of milk and other dairy product producers, and were represented throughout the transaction in issue by sophisticated Texas counsel. “(N]ot every negligent act is unfair or deceptive and thus unlawful under G.L.c. 93A, sec. 2.” Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983).
Given all of the foregoing, this Court rules that the greater burden to show a c. 93A, Sec. 11 claim has not been met.
Finally, the Court observes, as it did in its findings, that the Opinion Letter is that of Rubin and Rudman, LLP as a firm, not that of the individual attorneys who may have played a role in its creation. Based solely on the inclusion of the letters “LLP” in the firm’s name, and not upon any evidence presented, this Court presumes that Rubin and Rudman is a limited liability partnership. See G.L.c. 108A, Sec. 46; S.J.C Rule 3:06(2)(c). Nothing presented indicates that any of Messrs. Altman, Barton or Speleotis were themselves individually practicing *612 in some entity form. See, e.g., S.J.C. Rule 3:06(2)(a}, last sentence. Thus, the Court further assumes that defendants Messrs. Altman, Barton and Speleotis, at all material times, were among the “owners” of Rubin and Rudman, having been designated as partners thereof.
“Each owner of the entity shall be personally liable for the damages which arise out of the performance of legal services on behalf of the entity and which are caused by his or her own negligent or wrongful act, error, or omission.” S.J.C. Rule 3:06(3)(a). Here, although the Court finds the entity Rubin and Rudman, LLP liable pursuant to Count VI for negligent misrepresentation and Count VIII for common-law negligence, it does not find any of the three individual Rubin and Rudman defendants separately liable therefor. The misrepresentations and the negligence was the collective act or failure to act of the entity. No individual act or failure to act of any of the individual owners, standing alone, was directed at the plaintiffs or caused the plaintiffs harm. As to Messrs. Altman, Barton or Speleotis, none individually made any representations to any of the plaintiffs, nor did any of them individually commit any negligent acts toward any of the plaintiffs. It was the firm itself that had the duly and acted collectively with regard to the WLC group.
ORDER FOR JUDGMENT
The plaintiffs are directed, within 20 business days from the date hereof, to serve upon the Rubin and Rudman defendants an appropriately supported request for assessment of reasonable attorneys fees and reasonable costs consistent with the foregoing findings and rulings. Upon such service, the Rubin and Rudman defendants, within 20 business days from the date of such service, shall serve their response upon the plaintiffs. Thereafter, plaintiffs’ counsel shall file the total package, much like a Superior Court Rule 9A motion filing, with the Court for action.
After resolution of the attorneys fees and costs issues, final judgment against Rubin and Rudman, LLP only shall enter for the plaintiffs on Count VI and Count VIII of the Second Amended Complaint. The Second Amended Complaint shall be dismissed on Count VII and as against Michael L. Altman, Gene T. Barton and Charles J. Speleotis.

The number “01869" is the general number for West Lynn Creamery as a client. The number ”048" stands for the particular matter, e.g., here, “Criminal-Rebate Investigation.”

At the time of the entry of Exhibit 93, the defendants’ attorneys reserved their rights to check the mathematical accuracy of the summary and to challenge the reasonableness of the fees and expenses. Because Exhibit 93 is merely in gross summary form, the Court, post-trial, will permit the plaintiffs to support their fee claims and the defendants to challenge them in the usual fashion with affidavits and other supporting and opposing documentation and, if necessary, a hearing. At that time, the Court will have in mind the testimony of the plaintiffs’ expert, Mir. Stone, to the effect that the fees and expenses were reasonable. It is, however, the Court that must make the ultimate decision on this issue.

In addition to the earlier resolution of the claims against Pappathanasi and the two Scangas brothers, on October 6, 2004, the remaining parties stipulated to the dismissal, with prejudice, of Count II, Count IV, and any claim for willful or knowing conduct or trebling damages under Count VII. What remained thereafter to be tried were: Count VI against the Rubin and Rudman defendants for negligent misrepresentation; Count VII against the Rubin and Rudman defendants for violation of G.L.c. 93A for single damages, attorneys fees and costs; and Count VIII against the Rubin and Rudman defendants for negligence.

The TriBar Opinion Committee now consists of designees of the following organizations functioning as a single Committee: Special Committee on Legal Opinions in Commercial Transactions, New York County Lawyers’ Association; Corporation Law Committee, The Association of the Bar of the City of New York; and Special Committee on Legal Opinions of the Business Law Section, New York State Bar Association. Members of the Allegheny County (Pa.), Atlanta, Boston, Chicago, Delaware and Ontario Bar Associations and of the State Bar of Texas are also members of the Committee.

“Some opinion givers believe that statements dealing with factual matters should be referred to as ‘confirmations’ rather than opinions.” TriBar Report, p. 598, n.16.

This Court particularly does not accept Rubin and Rudman’s expert’s viewapparently strongly held, and certainly strongly statedthat trial lawyers are unable to comprehend the elegant nuances of corporate opinion letters or that matters relating to grand jury subpoenas are too “arcane” for corporate lawyers to be expected to divine.

A11 that either Mr. Altman or Mr. Barton had to do was place a telephone call to Mr. Merberg. If either of them had done so, they would have learned that the rebate investigation had not gone away. Rather, Gavriel, on March 25, 1998, had entered a plea agreement that included a provision that he would cooperate fully with law enforcement and government attorneys in an ongoing investigation. See Exhibit 41.

The Court does not accept the implication in the closing argument for the Rubin and Rudman defendants that the Opinion Letter was just an extraneous, perhaps redundant, piece of paper lying unnoticed and uncared for in a rack of documents at the closing, or that its existence as a requirement of closing was somehowno evidence showed howwaived by the plaintiffs.

In doing so, the Court is not ignoring the significant fact that something certainly should have come to Rubin and Rudman’s collective attention that would have caused doubt about the accuracy of such a confirmation.